# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

CESAR LOPEZ, JANICE POTTER, BRYAN SMITH, KEVIN CURRY, DANIEL STONE, SABRINA DITMORE, AARON HANSON, BRANDY STEWART, and RENARDO RISPER individually and on behalf of all others similarly situated,

Plaintiffs,

v.

WAKEFIELD & ASSOCIATES, LLC and REVCO SOLUTIONS, INC.,

Defendants.

**Case No.: 1:25-cv-02937-CYC**

**JURY TRIAL DEMANDED**

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Cesar Lopez, Janice Potter, Bryan Smith, Kevin Curry, Daniel Stone, Sabrina Ditmore, Aaron Hanson, Brandy Stewart, and Renardo Risper (collectively, "Plaintiffs"), on behalf of all others similarly situated, by and through their undersigned counsel, bring this Second Amended Consolidated Class Action Complaint against Wakefield & Associates, LLC ("Wakefield") and Revco Solutions, Inc. ("Revco") (collectively, "Defendants"). Plaintiffs allege the following upon information and belief based on and the investigation of counsel and matters of public record, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiffs and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information

("PII"[1]) and Protected Health Information ("PHI") and that was impacted in a data breach of Defendants' computer network ("Data Breach").

2. The Data Breach resulted in unauthorized disclosure, theft, and dissemination on the dark web of Plaintiffs' and Class Members' Private Information, which included their names, collection account information, Social Security numbers, driver's license or state identification card numbers, financial information, and health information (collectively, "Private Information).[2]

3. Defendants Data Breach affected current and former patients of Defendants' clients.

4. Defendants sourced the Private Information, stored it on their systems, and assumed a duty to protect it; but Wakefield never properly implemented the security safeguards it promised despite acknowledging their importance.

5. According to the "Notice of Data Privacy Event" posted on Defendant Wakefield's website, the Data Breach occurred on or before January 17, 2025.[3] Due to the paltry amount of information Defendants has provided about the Data Breach, it is unknown how it became aware it was hacked by cybercriminals or when it became aware.

6. However, Defendants only began notifying breach victims on November 7, 2025,[4] *almost ten months* after the Data Breach occurred.

7. It is unknown for precisely how long the cybercriminals had access to Defendants'

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] Ex. A.

[3] *Notice of Data Privacy Event*, Wakefield, https://wakeassoc.com/privacy-policy.

[4] *Notice of Security Incident*, Montana Dep't of Justice, https://dojmt.gov/wp-content/uploads/2025/11/Consumer-notification-letter-13.pdf; *see also* true and correct copies of the "Notice Letter" sent to Plaintiffs, attached hereto as ***Composite Exhibit A***.

network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to the Private Information in Defendants' care.

8. Defendants owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the Private Information, yet breached their duty by failing to implement or maintain adequate security practices.

9. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their private information and are now subject to an increased risk of identity theft and fraud as a result of the Data Breach.

10. Defendant, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practice appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiffs and Class Members, causing the exposure of Plaintiffs' and Class Members' Private Information.

11. As a result of Defendants' inadequate data security posture, Plaintiffs' and Class Members' Private Information was exposed to criminals who value Private Information for its utility in committing fraud and identity theft. Plaintiffs and the Class Members have suffered and will continue to suffer injuries including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal, medical, and financial information.

12. Plaintiffs bring this action on behalf of all persons whose Private Information was

compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures; and (iv) timely notify Plaintiffs and Class Members of the Data Breach.

13. Plaintiffs bring this action individually and on behalf of a Nationwide Class of similarly situated individuals against Defendants for: negligence; negligence *per se*; breach of third-party beneficiary contract; and invasion of privacy.

14. Plaintiffs seek to remedy these harms and prevent any future unauthorized disclosure of their Private Information on behalf of themselves, and all similarly situated persons whose personal data was targeted, compromised, and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

15. At all times relevant, Plaintiff Cesar Lopez was a citizen and resident of Mount Airy, North Carolina.

16. At all times relevant, Plaintiff Janice Potter was a citizen and resident of Winston-Salem, North Carolina.

17. At all times relevant, Plaintiff Bryan Smith was a citizen and resident of Maryville, Tennessee.

18. At all times relevant, Plaintiff Kevin Curry was a citizen and resident of Waxhaw, North Carolina.

19. At all times relevant, Plaintiff Daniel Stone was a citizen and resident of Columbia, South Carolina.

20. At all times relevant, Plaintiff Sabrina Ditmore was a citizen and resident of Maryville, Tennessee.

21. At all times relevant, Plaintiff Aaron Hanson was a citizen and resident of Havre, Montana.

22. At all times relevant, Plaintiff Brandy Stewart was a citizen and resident of Havre, Montana.

23. At all times relevant, Plaintiff Renardo Risper was a citizen and resident of North Carolina.

24. Defendant Wakefield is a Colorado limited liability company maintaining its headquarters and principal place of business at 830 East Platte Ave, Unit A, Fort Morgan, Colorado 80701. Wakefield is an unincorporated association and is deemed to be a citizen of the state where it has its principal place of business and the state under whose laws it is organized—*i.e.*, Colorado. *See* 28 U.S.C. § 1332(d)(10).

25. Defendant Revco Solutions, Inc. ("Revco") is a corporation organized under the laws of Delaware that conducts business nationwide, including in Colorado, and maintains its headquarters and principal place of business at 2700 Meridian Parkway, Suite 200, Durham, North Carolina 27713.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below, including Plaintiffs Lopez, Potter, Smith, Curry, Stone, Ditmore, Hanson, Stewart, and

Risper, is a citizen of a different state that is diverse from Defendant Wakefield's citizenship.[5] Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

27. This Court has personal jurisdiction over Defendants because Wakefield is organized under the laws of Colorado and maintains its principal place of business in Colorado, and because Revco, by virtue of its business relationship with Wakefield and its acquisition of Wakefield's operations, purposefully availed itself of the privilege of conducting business in this District and engaged in conduct giving rise to Plaintiffs' claims.

28. Venue is proper in this Court because Wakefield's principal place of business is located in this District and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Wakefield Collects the Private Information of Plaintiffs and the Class

29. Wakefield is a consulting firm that assists healthcare providers with revenue cycle and collections operations.[6]

30. As part of its business, Wakefield receives and maintains the Private Information of thousands of its clients' current and former patients. In collecting and maintaining the Private Information, Wakefield agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. Moreover, Plaintiffs and Class members themselves took reasonable steps to secure their Private Information.

31. In its Privacy Policy, Wakefield promises to "take precautions to ensure the

---

[5] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a8794077-a469-427d-887a-ed71e47efb9c.html (notification to Maine Attorney General indicating 41 Maine citizens affected by the Data Breach).

[6] *See* Ex. A.

security of your data in compliance with all applicable laws" including "physical, electronic, and procedural safeguards."[7]

32. Despite recognizing its duty to do so and boasting of its cybersecurity measures, on information and belief, Wakefield had not implemented reasonable cybersecurity safeguards or policies to protect its client's Private Information, nor had it supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, Wakefield left significant vulnerabilities in its systems for cybercriminals to exploit and gain access to the Private Information in Wakefield's possession.

33. Wakefield could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

34. As evidenced by the Data Breach, the Private Information contained in Wakefield's network and was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

35. Wakefield's failure to implement these standard and reasonable data security practices resulted in the exfiltration of Plaintiffs' and others' sensitive personal and health information.

**B. The Data Breach**

36. On or about November 7, 2025, Wakefield began sending a "Notice of Security Incident," informing its clients' patients that Wakefield "discovered suspicious activity related to

---

[7] *Privacy Policy*, WAKEFIELD, https://wakeassoc.com/privacy-policy.

certain systems."[8] Thereafter, it launched an investigation, which revealed that "there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025."[9]

37. Wakefield notified Plaintiffs and Class Members that the following types of information were accessed in the Data Breach: names, client IDs, dates of birth, Social Security numbers, health information, dates of service, and national provider IDs.[10] However, upon information and belief, Wakefield stores many more types of Private Information in its systems, including medical account details, account balances, driver's license and state ID numbers, financial account information, email addresses, and medical insurance information.

38. Wakefield failed to inform Plaintiffs and Class Member of key information, including why it took ten months to notify them of the Data Breach, who took the Private Information from Wakefield's systems, or what specific remedial measures were implemented to secure and protect the Private Information going forward.

---

[8] Ex. A.
[9] *Id.*
[10] *Id.*

39. On or about February 12, 2025, the Akira ransomware group claimed responsibility on its leak site for the Data Breach of Wakefield's systems and claimed to have taken 13 GB of data, including SSNs, passport numbers, confidential licenses, agreements, payment reports, internal email and correspondence, medical insurance documentation, and Medicare numbers of patients and employees.[11] A screenshot of Akira's posting is below:




40. Later, in September 2025, a second cybercriminal group, Coinbase Cartel, also listed Wakefield on its dark web site with a now offline repository link of Wakefield data. A screenshot of Coinbase Cartel's posting is below:

[11] *See* https://hipaatimes.com/wakefield-associates-confirms-healthcare-client-data-breach; https://www.hipaajournal.com/wakefield-associates-data-breach/




41. The Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA) released a joint report warning the public about Akira, stating that: "The FBI and cybersecurity researchers have observed Akira threat actors obtaining initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA) configured[.]"[12] "Akira threat actors leverage tools . . . to exfiltrate data."[13] "Akira threat actors use a double-extortion model [] and encrypt systems [] after exfiltrating data. The Akira ransom note provides each company with a unique code and instructions to contact the threat actors via a .onion URL."[14] A screenshot of Akira's ".onion" URL messaging is below:

---

[12] *#StopRansomware: Akira Ransomware*, FBI & CISA (April 18, 2024) https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a.
[13] *Id.*
[14] *Id.*




42. Upon information and belief, Wakefield lacked reasonable authentication practices, evidenced by hundreds of password credentials associated with Wakefield's email domains having been leaked online over a long period of time.

43. In Wakefield's case, the breadth of exposed Wakefield credentials over time makes it very likely that Wakefield's long-term reuse of passwords facilitated or amplified the ability of third parties to gain unauthorized access to Wakefield's systems in January 2025 and take the Private Information of Plaintiffs and Class Members.

44. In other words, the Data Breach was entirely foreseeable and preventable. Had Wakefield implemented basic cybersecurity measures, such as using complex passwords, frequently changing passwords, or using multifactor authentication, the Data Breach may never have occurred.

45. Because Wakefield wholly failed to protect the Private Information in its systems

and then failed to promptly send notice of the Data Breach, Plaintiffs and Class Members are, and will continue to be, at risk that their data will be illegally used to commit fraud and identity theft for years to come.

**C. Defendant Wakefield Failed to Prevent, Identify, and Timely Report the Data Breach.**

46. The Private Information that Wakefield allowed to be exposed in the Data Breach is the type of private information that Wakefield knew or should have known would be the target of cyberattacks.

47. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[15] Wakefield failed to disclose that its systems and security practices were inadequate to reasonably safeguard its past and present customers Private Information.

48. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[16] Immediate notification of a Data Breach is critical so that those impacted can promptly take measures to protect themselves.

49. By waiting ten months after the Data Breach to begin issuing notice, Wakefield failed to timely notify impacted individuals.

---

[15] Protecting Personal Information: A Guide for Business, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last visited Sept. 16, 2025).
[16] *Id.*

**D. Wakefield Knew—or Should Have Known—of the Risk of a Data Breach.**

50. Data breaches are preventable.[17] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[18] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[19]

51. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [20]

52. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023 there were 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. "In 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States

---

[17] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[18] *Id.* at 17.
[19] *Id.* at 28.
[20] *Id.*

population."[21]

53. In light of recent high profile data breaches at other healthcare organizations, including Yale New Haven Health (5.5 million records, April 2025), Episource, LLC (5.4 million records, June 2025), Blue Shield of California (4.7 million records, May 2025), Frederick Health Medical Group (934,326 records, February 2025), University of Pittsburgh Medical Center (712,000 records, March 2025), Wakefield knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

54. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.[22]

55. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and Wakefield.

56. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep Private Information private and secure, Wakefield failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

57. This readily available and accessible information confirms that, prior to the Data Breach, Wakefield knew or should have known that (i) ransomware actors were targeting entities such as Wakefield, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities

---

[21] Cybernews, *US Hospitals and Health Systems Data Breach* (Apr. 8, 2025), available at https://cybernews.com/security/us-hospitals-and-health-systems-data-breach/

[22] Ben Kochman, FBI, Secret Service Warn of Targeted Ransomware, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Sept. 16, 2025).

such as Wakefield, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

58. In light of the information readily available and accessible before the Data Breach, Wakefield, knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack.

**E. Defendant Revco Solutions' Relationship to Wakefield.**

59. Upon information and belief, in or about February 2025, Revco Solutions, Inc. publicly announced that it had entered into a strategic merger with Wakefield & Associates, LLC.[23]

60. In announcing the transaction, Revco stated that the merger combined Revco and Wakefield and that the resulting organization would operate under the Revco Solutions name.[24]

61. The precise terms of the merger or acquisition, including the allocation of liabilities and operational responsibilities, have not been publicly disclosed.

62. As recently as January 1, 2026, Wakefield's consumer payment processing website became unusable and redirected users to instructions directing them to contact Revco Solutions to make payments, indicating that Revco was handling or coordinating Wakefield's consumer-facing payment operations at that time.[25]

---

[23] *A Note from Mark Schabel, CEO of Revco Solutions*, (Feb. 17 2025), https://revcosolutions.com/revco-wakefield-strategic-merger-announcement/ (last visited Jan. 6, 2026).

[24] *Revco Solutions and Wakefield & Associates Announce Strategic Merger, Creating a Leading Healthcare Revenue Cycle Management Firm*, INSIDEARM, (Feb. 15, 2025), https://www.insidearm.com/news/00092907-revco-solutions-and-wakefield-associates/

[25] *See* WAKEFIELD, https://www.paywakefield.com/ (last visited Jan. 6, 2026).

63. Upon information and belief, following the announced merger, Revco exercised involvement in or control over at least certain Wakefield operations, including consumer-facing functions related to payments and account servicing and communications after the Data Breach.

64. Accordingly, the conduct described herein with respect to Wakefield occurred in the context of an ongoing business relationship with Revco and is attributable to Revco to the extent Revco assumed, controlled, directed, or ratified Wakefield's operations or conduct during the relevant period.

**F. Plaintiffs' Experiences and Injuries**

***Cesar Lopez***

65. Plaintiff Lopez is a patient of Defendants' client, a medical provider, that provided Plaintiff Lopez's Private Information to Defendants in the course of Defendants' regular business operations.

66. In November 2025, Plaintiff Lopez and his wife Miriam Lopez received a notice letter from Defendant, stating that their Private Information was accessed in Defendants' Data Breach in January 2025.

67. Because Defendants collected and maintained Plaintiff Lopez's Private Information, Plaintiff Lopez expected Defendants to use reasonable measures to protect the information according to state and federal law.

68. Plaintiff Lopez is very careful about sharing his sensitive Private Information. Plaintiff Lopez stores any documents containing his Private information in a safe and secure location. Plaintiff Lopez would not have entrusted his Private Information to Defendants' client had he known of Defendants' lax data security policies.

69. As a result of their inadequate cybersecurity measures and data destruction policies, Defendants exposed Plaintiff Lopez's Private Information for theft by cybercriminals,

which, based on the postings of cybercriminal groups Akira and Coinbase Cartel, was already posted for sale on the dark web.

70. Defendants deprived Plaintiff Lopez of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

71. In spring 2025, Mount Airy Nissan contacted Plaintiff Lopez regarding completing purchase of a vehicle, of which Plaintiff Lopez had no prior knowledge. Plaintiff Lopez realized that someone had obtained his Social Security number and was committing identity theft to open a car loan in his name.

72. Plaintiff Lopez suffered violation of his right to privacy, an actual injury, from the exposure of his Private Information.

73. Plaintiff Lopez also suffered actual injury in the form of damages to and diminution in the value of his Private Information. Indeed, Private Information is a valuable form of intangible property that allows Plaintiff to utilize his credit—and Defendants were required to adequately protect his Private Information.

74. As a result of the Data Breach, Plaintiff Lopez has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information.

75. Since the Data Breach, Plaintiff Lopez has experienced a significant influx of phishing communications, which costs him valuable time.

76. Further, Plaintiff Lopez has spent several hours of his time researching the Data Breach, contacting counsel, and dealing with the fraudulent attempt to open a loan with his name and Social Security number.

77. Because of the Data Breach, Plaintiff Lopez will continue to spend considerable

time and effort monitoring his accounts to protect himself from identity theft and fraud. Plaintiff Lopez fears for his personal financial security and uncertainty over what criminals will do with his Private Information.

78. Plaintiff Lopez now suffers feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

79. Plaintiff Lopez is now subject to the present and continuing risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendants' failure to promptly inform Plaintiff Lopez about the Data Breach.

80. Plaintiff Lopez has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

***Janice Potter***

81. Plaintiff Potter is a patient of Defendants' client, a medical provider, that provided Plaintiff Potter's Private Information to Defendants in the course of Defendants' regular business operations.

82. In November 2025, Plaintiff Potter received a notice letter from Defendant, informing her that her Private Information was accessed in Defendants' Data Breach.

83. Because Defendants collected and maintained Plaintiff Potter's Private Information, Plaintiff Potter expected Defendants to use reasonable measures to protect the information according to state and federal law.

84. Plaintiff Potter is very careful about sharing her sensitive Private Information.

Plaintiff Potter stores any documents containing her Private information in a safe and secure location. Plaintiff Potter would not have entrusted her Private Information to Defendants' client had she known of Defendants' lax data security policies.

85. As a result of their inadequate cybersecurity measures and data destruction policies, Defendants exposed Plaintiff Potter's Private Information for theft by cybercriminals, which, based on the postings of cybercriminal groups Akira and Coinbase Cartel, was already posted for sale on the dark web.

86. In fact, Plaintiff Potter signed up for an Experian credit monitoring service after the Data Breach, which costs her $19 monthly. After the Data Breach, Experian notified her that her Private Information was found on the dark web, which Plaintiff Potter believes can only be because of the Data Breach.

87. Defendants deprived Plaintiff Potter of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify her about the Data Breach.

88. Plaintiff Potter suffered violation of her right to privacy, an actual injury, from the exposure of her Private Information.

89. Plaintiff Potter also suffered actual injury in the form of damages to and diminution in the value of her Private Information. Indeed, Private Information is a valuable form of intangible property that allows Plaintiff to utilize her credit—and Defendants were required to adequately protect her Private Information.

90. As a result of the Data Breach, Plaintiff Potter has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, signing up for credit monitoring, reviewing credit card and financial account statements, and monitoring her credit information.

91. Since the Data Breach, Plaintiff Potter has experienced a significant influx of phishing calls. Plaintiff Potter now spends significant time trying to discern whether calls she receives are real or spam, an actual injury that costs her valuable time.

92. Because of the Data Breach, Plaintiff Potter will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft and fraud. Plaintiff Potter fears for her personal financial security and uncertainty over what criminals will do with her Private Information.

93. Plaintiff Potter now suffers feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

94. Plaintiff Potter is now subject to the present and continuing risk of fraud, identity theft, and misuse for the remainder of her lifetime resulting from her Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendants' failure to promptly inform Plaintiff Potter about the Data Breach.

95. Plaintiff Potter has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

***Bryan Smith***

96. Plaintiff Smith is a patient of Defendants' client, a medical provider, that provided Plaintiff Smith's Private Information to Defendants in the course of Defendants' regular business operations.

97. In late 2025, Plaintiff Smith received a notice letter from Defendant, informing him that his Private Information was accessed in Defendants' Data Breach.

98. Because Defendants collected and maintained Plaintiff Smith's Private Information, Plaintiff Smith expected Defendants to use reasonable measures to protect the information according to state and federal law.

99. Plaintiff Smith is very careful about sharing his sensitive Private Information. Plaintiff Smith stores any documents containing his Private information in a safe and secure location. Plaintiff Smith would not have entrusted his Private Information to Defendants' client had he known of Defendants' lax data security policies.

100. As a result of their inadequate cybersecurity measures and data destruction policies, Defendants exposed Plaintiff Smith's Private Information for theft by cybercriminals, which, based on the postings of cybercriminal groups Akira and Coinbase Cartel, was already posted for sale on the dark web.

101. Defendants deprived Plaintiff Smith of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

102. Plaintiff Smith suffered violation of his right to privacy, an actual injury, from the exposure of his Private Information.

103. Plaintiff Smith also suffered actual injury in the form of damages to and diminution in the value of his Private Information. Indeed, Private Information is a valuable form of intangible property that allows Plaintiff to utilize his credit—and Defendants were required to adequately protect his Private Information.

104. As a result of the Data Breach, Plaintiff Smith has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information.

105. Since the Data Breach, Plaintiff Smith has experienced a huge influx of phishing

emails, falsely alerting him to transfer funds into his accounts and notifying him that he has been pre-approved for loans for which he never applied. Plaintiff Smith never received these types of emails prior to the Data Breach, but Plaintiff Smith now estimates spending three hours each week sorting through these communications, an actual injury that costs him valuable time.

106. Because of the Data Breach, Plaintiff Smith will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft and fraud. Plaintiff Smith fears for his personal financial security and uncertainty over what criminals will do with his Private Information.

107. Plaintiff Smith now suffers feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

108. Plaintiff Smith is now subject to the present and continuing risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendants' failure to promptly inform Plaintiff Smith about the Data Breach.

109. Plaintiff Smith has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

***Kevin Curry***

110. Plaintiff Curry is a former patient of Defendants' client, who is a medical provider, that provided Plaintiff Curry's Private Information to Defendants in the course of Defendants' regular business operations.

111. In November 2025, Kevin Curry received a notice letter from Defendant,

informing him that his Private Information was accessed in Defendants' Data Breach.

112. Because Defendants collected and maintained Plaintiff Curry's Private Information, Plaintiff expected Defendants to use reasonable measures to protect the information according to state and federal law.

113. Plaintiff Curry is extremely careful about sharing his sensitive Private Information and is hyper vigilant about his credit score. Plaintiff stores any documents containing his Private Information in a safe and secure location. Plaintiff would not have entrusted his Private Information to Defendants' client had he known of Defendants' lax data security policies.

114. As a result of their inadequate cybersecurity measures and data destruction policies, Defendants exposed Plaintiff Curry's Private Information for theft by cybercriminals, which, based on the postings of cybercriminal groups Akira and Coinbase Cartel, was already posted for sale on the dark web.

115. Defendants deprived Plaintiff Curry of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

116. After the Data Breach, Plaintiff Curry was notified that his Private Information was found on the dark web, which Plaintiff believes was caused by the Data Breach.

117. Plaintiff Curry has suffered violation of his right to privacy, an actual injury, from the exposure of his Private Information.

118. Plaintiff Curry also suffered actual injury in the form of damages to and diminution in the value of his Private Information. Indeed, Private Information is a valuable form of intangible property that allows Plaintiff to utilize his credit—and Defendants were required to adequately protect his Private Information.

119. As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts

to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, monitoring his credit information, and changing his passwords.

120. Since the Data Breach, Plaintiff has experienced a significant influx of phishing communications, which costs him valuable time to sort through.

121. Because of the Data Breach, Plaintiff Curry will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft and fraud. Plaintiff fears for his personal financial security and uncertainty over what criminals will do with his Private Information.

122. Plaintiff Curry now suffers feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

123. Plaintiff Curry is subject to the present and continuing risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury is worsened and exacerbated by Defendants' failure to promptly inform Plaintiff about the Data Breach.

124. Plaintiff Curry has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches

***Daniel Stone***

125. Plaintiff Stone is a former patient of Defendants' client, a medical provider, that provided Plaintiff Stone's Private Information to Defendants in the course of Defendants' regular business operations.

126. In November 2025, Plaintiff Stone received a notice letter from Defendant, informing him that his Private Information was accessed in Defendants' Data Breach.

127. Because Defendants collected and maintained Plaintiff Stone's Private Information, Plaintiff Stone expected Defendants to use reasonable measures to protect the information according to state and federal law.

128. Plaintiff Stone is very careful about sharing his sensitive Private Information and is hyper vigilant about his credit score. Plaintiff Stone stores any documents containing his Private information in a safe and secure location. Plaintiff Stone would not have entrusted his Private Information to Defendants' client had he known of Defendants' lax data security policies.

129. As a result of its inadequate cybersecurity measures and data destruction policies, Defendants exposed Plaintiff Stone's Private Information for theft by cybercriminals, which, based on the postings of cybercriminal groups Akira and Coinbase Cartel, was already posted for sale on the dark web.

130. Defendants deprived Plaintiff Stone of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

131. After the Data Breach, Plaintiff Stone was notified that his Private Information was found on the dark web, which Plaintiff Stone believes was caused by the Data Breach.

132. Plaintiff Stone suffered violation of his right to privacy, an actual injury, from the exposure of his Private Information.

133. Plaintiff Stone also suffered actual injury in the form of damages to and diminution in the value of his Private Information. Indeed, Private Information is a valuable form of intangible property that allows Plaintiff to utilize his credit—and Defendants were required to adequately protect his Private Information.

134. As a result of the Data Breach, Plaintiff Stone has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, monitoring his credit information, and changing his passwords.

135. Since the Data Breach, Plaintiff Stone has experienced a significant influx of phishing communications, which costs him valuable time to sort through.

136. Because of the Data Breach, Plaintiff Stone will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft and fraud. Plaintiff Stone fears for his personal financial security and uncertainty over what criminals will do with his Private Information.

137. Plaintiff Stone now suffers feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

138. Plaintiff Stone is now subject to the present and continuing risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendants' failure to promptly inform Plaintiff Stone about the Data Breach.

139. Plaintiff Stone has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

***Sabrina Ditmore***

140. Plaintiff Ditmore is a former patient of Defendants' client, a medical provider, that provided Plaintiff Ditmore's Private Information to Defendants in the course of Defendants'

regular business operations.

141. Plaintiff Sabrina Ditmore received multiple letters from Defendant, attempting to collect debts from her.

142. In November 2025, Plaintiff Ditmore received a notice letter from Defendants, informing her that her Private Information was accessed in Defendants' Data Breach.

143. Because Defendants collected and maintained Plaintiff Ditmore's Private Information, Plaintiff Ditmore expected Defendants to use reasonable measures to protect the information according to state and federal law.

144. Plaintiff Sabrina Ditmore provided her Private Information to Defendants or their clients and trusted that the company would use reasonable measures to protect it according to state and federal law.

145. Plaintiff Sabrina Ditmore suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

146. Plaintiff Sabrina Ditmore is very careful about sharing her sensitive Private Information. Plaintiff Sabrina Ditmore stores any documents containing her Private information in a safe and secure location. Plaintiff Sabrina Ditmore would not have entrusted her Private Information to Defendants or their clients had she known of Defendants' lax data security policies.

147. As a result of their inadequate cybersecurity measures and data destruction policies, Defendants exposed Plaintiff Sabrina Ditmore's Private Information for theft by cybercriminals and given the purpose of the hack, for sale on the dark web.

148. Upon information and belief, an Experian monitoring search revealed that Sabrina Ditmore's Private Information has been identified on the dark web, confirming that her information was not merely exposed but has been actively trafficked by cybercriminals following

the Data Breach.

149. Defendants deprived Plaintiff Sabrina Ditmore of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Data Breach.

150. Plaintiff Sabrina Ditmore suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property, property that Defendants were required to adequately protect.

151. As a result of the Data Breach, Plaintiff Sabrina Ditmore has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements and monitoring her credit information.

152. In addition to the risk of future harm, Plaintiff Sabrina Ditmore has already suffered actual financial harm. Following the Data Breach, Mrs. Ditmore experienced fraudulent activity involving her bank account, including unauthorized transactions that required her to take corrective action to secure her account and mitigate further losses.

153. Plaintiff Sabrina Ditmore has also suffered actual injury from the dramatic increase in spam, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.

154. Plaintiff Sabrina Ditmore will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft. Plaintiff Sabrina Ditmore fears for her personal financial security and uncertainty over what Private Information was exposed. Plaintiff Sabrina Ditmore has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

155. Plaintiff Sabrina Ditmore is now subject to the present and continuing risk of fraud, identity theft, and misuse for the remainder of her lifetime resulting from her Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendants' failure to promptly inform Plaintiff Sabrina Ditmore about the Data Breach.

156. Plaintiff Sabrina Ditmore has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches

***Aaron Hanson***

157. Plaintiff Aaron Hanson is a former patient of Defendants' client, a medical provider, that provided Plaintiff Hanson's Private Information to Defendants in the course of Defendants' regular business operations.

158. Plaintiff Hanson provided Defendants' clients with his sensitive PII and PHI as a condition of receiving Defendants' clients' services.

159. In November 2025, Plaintiff Hanson received a notice letter from Defendants, informing him that his Private Information was accessed in Defendants' Data Breach.

160. Plaintiff Hanson was especially alarmed by the breadth of information involved in the Data Breach. Defendants' letter acknowledges that information such as "name and the following types of information were involved in this incident" Client ID or Client Number, Date of Birth, Health Information, Dates of Service" was compromised by the Data Breach.

161. Plaintiff Hanson provided his Private Information to Defendants' clients with the reasonable expectation that any entity later holding that information, including Defendant, would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Hanson's Private

Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

162. Plaintiff Hanson reasonably understood that Defendant, in possessing and using his information on behalf of its clients, would maintain adequate cybersecurity and protection of Private Information.

163. Plaintiff Hanson is very careful about sharing his sensitive PII and PHI. They have never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. Plaintiff Hanson also stores any documents containing his sensitive information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

164. Plaintiff Hanson has made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, monitoring his credit information, and changing passwords on his various accounts.

165. Plaintiff Hanson has already spent much time monitoring his account to protect themselves and will continue to spend significant time and effort monitoring his accounts to protect himself from identity theft.

166. Plaintiff Hanson fears for his personal financial security and worries about what information was exposed in the Data Breach.

167. Plaintiff Hanson knows that cybercriminals often sell Private Information, and that his PII or PHI could be abused months or even years after a data breach.

168. Plaintiff Hanson would not have provided his Private Information to the entities that then transmitted that information to Defendant had they known that Defendant would not take reasonable steps to safeguard it.

169. Because of Defendants' Data Breach, Plaintiff Hanson has suffered, and will continue to suffer from, anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Hanson's injuries are precisely the type of injuries that the law contemplates and addresses.

170. Plaintiff Hanson suffered actual injury from the exposure and theft of his Private Information, which violates his rights to privacy.

171. Plaintiff Hanson suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property, property that Defendant was required to adequately protect.

172. Plaintiff Hanson suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft, all because Defendants' Data Breach placed Plaintiff Hanson's Private Information right in the hands of criminals.

173. Because of the Data Breach, Plaintiff Hanson anticipates spending considerable amounts of time and money to try and mitigate his injuries.

***Brandy Stewart***

174. Plaintiff Brandy Stewart is a former patient of Defendants' client, a medical provider, that provided Plaintiff Stewart's Private Information to Defendants in the course of Defendants' regular business operations.

175. Plaintiff Stewart provided Defendants' clients with her sensitive PII and PHI as a condition of receiving Defendants' clients' services.

176. In November 2025, Plaintiff Stewart received a notice letter from Defendants, informing him that her Private Information was accessed in Defendants' Data Breach.

177. Plaintiff Stewart was especially alarmed by the breadth of information involved in the Data Breach. Defendants' letter acknowledges that information such as "name and the following types of information were involved in this incident" Client ID or Client Number, Date of Birth, Health Information, Dates of Service" was compromised by the Data Breach.

178. Plaintiff Stewart provided her Private Information to Defendants' clients with the reasonable expectation that any entity later holding that information, including Defendant, would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Stewart's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

179. Plaintiff Stewart reasonably understood that Defendant, in possessing and using her information on behalf of its clients, would maintain adequate cybersecurity and protection of Private Information.

180. Plaintiff Stewart is very careful about sharing her sensitive PII and PHI. They have never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. Plaintiff Stewart also stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

181. Plaintiff Stewart has made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, monitoring her credit information, and changing passwords on her various accounts.

182. Plaintiff Stewart has already spent much time monitoring her account to protect themselves and will continue to spend significant time and effort monitoring her accounts to protect herself from identity theft.

183. Plaintiff Stewart fears for her personal financial security and worries about what information was exposed in the Data Breach.

184. Plaintiff Stewart knows that cybercriminals often sell Private Information, and that her PII or PHI could be abused months or even years after a data breach.

185. Plaintiff Stewart would not have provided her Private Information to the entities that then transmitted that information to Defendant had they known that Defendant would not take reasonable steps to safeguard it.

186. Because of Defendants' Data Breach, Plaintiff Stewart has suffered, and will continue to suffer from, anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Stewart's injuries are precisely the type of injuries that the law contemplates and addresses.

187. Plaintiff Stewart suffered actual injury from the exposure and theft of her Private Information which violates her rights to privacy.

188. Plaintiff Stewart suffered actual injury in the form of damages to and diminution in the value of hers Private Information. After all, Private Information is a form of intangible property, property that Defendant was required to adequately protect.

189. Plaintiff Stewart suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft because Defendants' Data Breach placed Plaintiff Stewart's Private Information right in the hands of criminals.

190. Because of the Data Breach, Plaintiff Stewart anticipates spending considerable amounts of time and money to try and mitigate her injuries.

***Renardo Risper***

191. Plaintiff Renardo Risper is a former patient of Defendants' client, a medical provider, that provided Plaintiff Risper's Private Information to Defendants in the course of Defendants' regular business operations.

192. Plaintiff Risper provided Defendants' clients with his sensitive PII and PHI as a condition of receiving Defendants' clients' services.

193. In November 2025, Plaintiff Risper received a notice letter from Defendants, informing him that his Private Information was accessed in Defendants' Data Breach.

194. Plaintiff Risper was especially alarmed by the breadth of information involved in the Data Breach. Defendants' letter acknowledges that information such as "name and the following types of information were involved in this incident" Client ID or Client Number, Date of Birth, Health Information, Dates of Service" was compromised by the Data Breach.

195. Plaintiff Risper provided his Private Information to Defendants' clients with the reasonable expectation that any entity later holding that information, including Defendant, would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Risper's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

196. Plaintiff Risper reasonably understood that Defendant, in possessing and using his information on behalf of its clients, would maintain adequate cybersecurity and protection of Private Information.

197. Plaintiff Risper is very careful about sharing his sensitive PII and PHI. They have never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. Plaintiff Risper also stores any documents containing his sensitive information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

198. Plaintiff Risper has made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, monitoring his credit information, and changing passwords on his various accounts.

199. Plaintiff Risper has already spent much time monitoring his account to protect himself and will continue to spend significant time and effort monitoring his accounts to protect himself from identity theft.

200. Plaintiff Risper fears for his personal financial security and worries about what information was exposed in the Data Breach.

201. Plaintiff Risper knows that cybercriminals often sell Private Information, and that his PII or PHI could be abused months or even years after a data breach.

202. Plaintiff Risper would not have provided his Private Information to the entities that then transmitted that information to Defendant had they known that Defendant would not take reasonable steps to safeguard it.

203. Because of Defendants' Data Breach, Plaintiff Risper has suffered, and will continue to suffer from, anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Risper's injuries are precisely the type of injuries that the law contemplates and addresses.

204. Plaintiff Risper suffered actual injury from the exposure and theft of his Private Information, which violates his rights to privacy.

205. Plaintiff Risper suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property, property that Defendant was required to adequately protect.

206. Plaintiff Risper suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft, all because Defendants' Data Breach placed Plaintiff Risper's Private Information right in the hands of criminals.

207. Because of the Data Breach, Plaintiff Risper anticipates spending considerable amounts of time and money to try and mitigate his injuries

**G. Plaintiffs and the Class Suffered Common Injuries and Damages Due to Defendants' Conduct.**

208. Defendants' failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members who are under a present and continuing risk of identity theft and fraud as a result of the Data Breach.

209. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, inter alia, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. identity theft and fraud;

b. loss of time to mitigate the risk of identity theft and fraud

c. diminution in value of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity

theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. loss of the opportunity to control how their Private Information is used;

g. compromise and continuing publication of their Private Information;

h. unauthorized use of their stolen Private Information;

i. invasion of privacy; and

j. continued risk to their Private Information —which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fail to take appropriate measures to protect the Private Information.

**H. Significant Risk of Continued Identity Theft**

210. Plaintiffs and Class Members are at a heightened risk of identity theft for the remainder of their lifetimes because of the Data Breach.

211. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

212. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

213. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information.

Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

214. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[26] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[27] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

215. The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can now easily access Plaintiffs' and Class Members' Private Information.

216. The value of Plaintiffs' and Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years and is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained. criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

---

[26] What Is the Dark Web? EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/
[27] *Id.*

217. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information far and wide.

218. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

219. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

220. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[28] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Sept. 16, 2025).

can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

221. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

222. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's Private Information to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[29]

[29] Identity Theft and Your Social Security Number, SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited Sept. 16, 2025).

223. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[30]

224. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a 's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[31] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[32]

225. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers,

---

[30] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

[31] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[32] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

> having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[33]

226. The “high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online.”[34]

227. Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It’s hard to change your Social Security number and it’s not a good idea because it is connected to your life in so many ways.[35] (Emphasis added).

228. Identity thieves can also use Social Security numbers to obtain a driver’s license or official identification card in the victim’s name but with the thief’s picture; use the victim’s name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim’s information. In addition, identity thieves may obtain a job using the victim’s Social Security number, rent a house or receive medical services in the victim’s name, and may even give the victim’s personal information to police during an arrest resulting in an arrest warrant being issued in the victim’s name. And the Social Security Administration has warned that identity thieves can use an individual’s Social Security number to apply for additional credit

---

[33] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[34] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[35] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

lines.[36]

229. The Social Security Administration further stresses that:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[37]

230. Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[38]

231. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[39]

232. According to national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of

---

[36] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[37] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[38] *Hackers Stole Consumers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited July 31, 2023).

[39] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited Feb. 21, 2023)

information to keep safe from thieves.

233. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[40] However, this is not the case. As cybersecurity experts point out:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.[41]

234. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in by the New York Times.[42]

235. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, health information, and names.

236. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[43]

237. Further, according to the same report, "rapid reporting can help law enforcement

---

[40] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-consumers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited Feb. 21, 2023).
[41] *Id.*
[42] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited Feb. 21, 2023).
[43] 2019 Internet Crime Report (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-Internet-crime-report-released-021120 (last visited Sept. 16, 2025).

stop fraudulent transactions before a victim loses the money for good."[44] Yet, Defendants failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen. Defendants' failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take necessary steps to mitigate the harm caused by the Data Breach.

238. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

239. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

240. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### I. Loss of Time to Mitigate the Risk of Identify Theft and Fraud

241. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the

[44] *Id.*

dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

242. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

243. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

244. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

245. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[45]

246. According to the U.S. Government Accountability Office, which conducted a study

---

[45] See Federal Trade Commission, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited Sept. 16, 2025).

regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[46]

247. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants' conduct that caused the Data Breach.

**J. Diminished Value of Private Information**

248. Personal data like Private Information is a valuable property right.[47]

249. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

250. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[48]

251. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and

---

[46] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

[47] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited Sept. 16, 2025).

[48] Shadowy data brokers make the most of their invisibility cloak (Nov. 5, 2019) LA TIMES, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 16, 2025).

provides it to marketers or app developers.[49] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[50]

252. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

253. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

**K. Future Cost of Credit and Identify Theft Monitoring Is Reasonable and Necessary.**

254. To date, Defendants have done little to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

255. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

256. Such fraud may go undetected until debt collection calls commence months, or even

---

[49] The Personal Data Revolution, DATA COUP, https://datacoup.com/ and How it Works, DIGI.ME, https://digi.me/what-is-digime/ (last visited Sept. 16, 2025).

[50] Frequently Asked Questions, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept 15., 2025).

years, later. An individual may not know that their information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

257. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[51]

258. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

259. Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

260. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

**L. Defendants Failed to Adhere to HIPAA Regulations.**

261. As a business associate of medical providers, Defendants are HIPAA covered entities and were required to maintain the confidentiality of the Private Information in its possession. 45 CFR 160.103.

262. HIPAA circumscribes security provisions and data privacy responsibilities

---

[51] Jesse Damiani, Your Social Security Number Costs $4 On The Dark Web, New Report Finds, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited Sept. 16, 2025).

designed to keep Defendants' clients' current and former patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information. [52]

263. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[53]

264. The Data Breach itself resulted from a combination of inadequacies showing Defendants' failure to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Defendants in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic

---

[52] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, inter alia: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[53] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

265. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

**M. Defendants Failed to Adhere to FTC Guidelines.**

266. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of Private Information.

267. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide

for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should: (i) protect the personal customer information that they keep; (ii) properly dispose of personal information that is no longer needed; (iii) encrypt information stored on computer networks; (iv) understand their network's vulnerabilities; and (v) implement policies to correct security problems.

268. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

269. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

270. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

271. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**N. Defendants Failed to Follow Industry Standards.**

272. Experts studying cybersecurity routinely identify financial corporations as being

particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

273. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

274. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

275. Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendants should have promptly deleted any data it no longer needed to provide services to Plaintiffs and the Class.

276. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC),

which are well respected authorities in reasonable cybersecurity readiness.

277. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

**O. The Data Breach Has Caused Significant Harm.**

278. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."54

279. The type of data that may have been accessed and compromised here can be use to perpetrate fraud and identity theft.

280. Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

281. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

282. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web

[54] Prevention and Preparedness, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited Sept. 16, 2025).

where malicious actors buy and sell that information for profit.[55]

283. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[56] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[57]

284. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[58] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[59]

285. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[60]

286. As a result of the Data Breach, the Private Information of Plaintiffs and Class

---

[55] Shining a Light on the Dark Web with Identity Monitoring, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Sept. 16, 2025).
[56] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Sept. 16, 2025).
[57] *Id.*
[58] *Id.*
[59] Bryan Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Sept. 16, 2025).
[60] 2019 Internet Crime Report Released, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-Internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited Sept. 16, 2025).

Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further injurious breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

287. In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

288. Defendants disregarded the rights of Plaintiffs and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (b) failing to disclose that it did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' Private Information; (c) failing to take

standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

289. The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

## CLASS ALLEGATIONS

290. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action individually and on behalf of the following Class:

> All persons whose Private Information was compromised in the Data Breach, including all who received notice from Defendants (the "Class").

291. Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

292. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

293. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

294. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class is comprised of tens of thousands of members. The Class is sufficiently numerous to warrant certification.

295. Typicality of Claims: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harm suffered by Plaintiffs is similar to that suffered by all other Class Members which was caused by the same misconduct by Defendant.

296. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

297. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for

their wrongdoing as asserted herein.

298. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendants' storage of Plaintiffs' and Class Member's Private Information was done in a negligent manner;

d. Whether Defendants had a duty to protect and safeguard Plaintiffs' and Class Members' Private Information;

e. Whether Defendants' conduct was negligent;

f. Whether Defendants' conduct violated Plaintiffs' and Class Members' privacy;

g. Whether Defendants' conduct violated the statutes as set forth herein;

h. Whether Defendants took sufficient steps to secure its past and present customers Private Information;

i. Whether Defendants was unjustly enriched; and

j. The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

299. Information concerning Defendants' policies is available from Defendants'

records.

300. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

301. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

302. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

Each Count is asserted against all Defendants and is based on Defendants' direct conduct and, alternatively, on principles of successor liability, agency, ratification, and vicarious liability.

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

303. Plaintiffs incorporate by reference and re-allege all preceding allegations as though fully set forth herein.

304. Plaintiffs bring this claim individually and on behalf of the Class Members.

305. Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

306. Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

307. Defendants had, and continues to have, a duty to timely disclose that Plaintiffs' and Class Members' Private Information within their possession was compromised and precisely the types of information that were compromised.

308. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

309. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their clients' customers. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

310. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

311. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information.

312. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems; and

c. Failing to periodically ensure that their computer systems and networks had plans in place to maintain reasonable data security safeguards.

313. Defendant, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

314. Defendant, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

315. Defendant, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiffs and Class Members that the Private Information within Defendants' possession might have been compromised and precisely the type of information compromised.

316. Defendants breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendants failed to implement proper data security procedures to adequately and reasonably protect Plaintiffs' and Class Members' Private Information. In violation of the FTC guidelines, *inter alia,* Defendants did not protect the Private Information it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of their networks' vulnerabilities; and failed to implement policies to correct security issues.

317. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high

frequency of cyberattacks and data breaches.

318. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

319. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

320. But for Defendants' negligent conduct and breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

321. As a result of Defendants' failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

322. As a result of Defendants' negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

323. Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 296 above, as though fully set forth herein.

324. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Private Information.

325. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect their clients' current and former patients' Private Information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the members of the Class's Private Information.

326. Defendants breached their duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information, including data encryption, regular password changes for Wakefield email domains, and multifactor authentication to access Wakefield's systems.

327. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their consumers, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

328. Defendants' duty to use reasonable security measures under HIPAA required

Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

329. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

330. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and the Class's Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damage that would result to individuals in the event of a breach, which ultimately came to pass.

331. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

332. Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed supra. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants collected and stored and the foreseeable consequences of a data breach,

including, specifically, the immense damage that would result to individuals in the event of a breach, which ultimately came to pass.

333. Plaintiffs and Class Members are within the class of persons the statutes were intended to protect and the harm resulting from the Data Breach is the type of harm that statutes were intended to protect against.

334. But for Defendants' wrongful and negligent breach of the duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

335. The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

336. Had Plaintiffs and the Class known that Defendants did not adequately protect their Private Information, Plaintiffs and members of the Class would not have entrusted Defendants with their Private Information.

337. Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence per se.

338. As a direct and proximate result of Defendants' negligence per se, Plaintiffs and the Class have suffered harm, including loss of time and money resolving fraudulent activity; loss of time and money obtaining protections against future identity theft; lost control over the value of Private Information; harm resulting from damaged credit scores; and other harm resulting from the unauthorized use and imminent threat of unauthorized use of stolen Private Information, entitling them to damages in an amount to be proven at trial.

339. Additionally, as a direct and proximate result of Defendants' negligence per se, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their Private Information in their continued possession.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

340. Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 296 above, as though fully set forth herein.

341. On information and belief, Defendants entered into contracts to provide financial services to their clients, which were made for the benefit of Plaintiffs and Class Members.

342. On information and belief, these contracts are virtually identical and were made expressly for the benefit of Plaintiffs and Class Members, as it was their Private Information that Defendants agreed to receive and protect through their services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and Class Members was a direct and primary objective of the contracting parties.

343. Defendants knew that if they were to breach these contracts with their clients, Plaintiffs and Class Members would be harmed.

344. Defendants breached their contracts with their clients by failing to protect the Private Information it obtained pursuant to these contracts.

345. As a result Plaintiffs and Class Members were harmed by this Data Breach when Defendants failed to use reasonable data security measures that could have prevented the Data Breach, and when it failed to timely notify Plaintiffs and Class Members regarding the breach, so that they could protect themselves.

346. As foreseen, Plaintiffs and Class Members were harmed by Defendants' failure to use reasonable data security measures to secure the Private Information from unauthorized access and failure to timely notify Plaintiffs and Class Members, which harms include, but are not limited to: (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) emotional distress due to their Private Information's publication on the dark web; (e) existing misuse of their Private Information in the form of fraud, identity theft, and increased, unwanted spam communications; and (f) the continued and certainly increased risk to their Private Information, which remains in Defendants' possession in unencrypted form and subject to further unauthorized disclosures.

347. Accordingly, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial, including actual, consequential, and nominal damages, along with costs and attorneys' fees incurred in this action.

**COUNT IV**
**INVASION OF PRIVACY—INTRUCTION UPON SECLUSION**
**(On Behalf of Plaintiffs and the Class)**

348. Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 296 above, as though fully set forth herein.

349. Plaintiffs and Class Members had a legitimate expectation of privacy in their Private Information and were entitled to Defendants' protection of this Private Information in their possession against disclosure to unauthorized third parties.

350. Defendants owed a duty to Plaintiffs and Class Members, as patients of their clients, to keep their Private Information confidential and secure.

351. Defendants failed to protect Plaintiffs' and Class Members' Private Information

and instead exposed it to unauthorized persons, at least two notorious ransomware groups, which have already made the Private Information publicly available, including through publishing the data on their dark web leak sites, where cybercriminals go to find their next identity theft and extortion victims.

352. Upon information and belief, Wakefield failed to require its employees to regularly change their passwords, resulting in Wakefield email addresses and passwords having been leaked on the dark web for a long period of time. Upon information and belief, Wakefield also did not encrypt the Private Information in its systems or utilize multifactor authentication to access its systems.

353. All of these failures meant that it was substantially certain that Defendants would be subjected to a data breach and that cybercriminals would easily exfiltrate the Private Information in Wakefield's systems, resulting in the Private Information being made available for criminal misuse.

354. Through their knowingly inadequate data security measures, Defendants allowed unauthorized third parties to access and take the Private Information of Plaintiffs and Class Members.

355. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable person and represents an intrusion upon Plaintiffs' and Class Members' seclusion, as well as a public disclosure of private facts.

356. The intrusion was into a place or thing, which was private and is entitled to be private—sensitive and confidential information including private medical histories, diagnoses, and prescriptions.

357. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization, given the sensitivity of the information Defendants maintained and Defendants' representations to that effect.[61]

358. Subsequent to the intrusion, Defendants permitted Plaintiffs' and Class Members' data to be published online to countless cybercriminals whose mission is to misuse such information, including through identity theft, fraud, and extortion.

359. Defendants acted intentionally under the definition provided in the Restatement (Second) of Torts § 8A, which includes situations in which the tortfeasor is "substantially certain" of the consequences of their actions. Here, given the frequent nature of data breaches and the clear inadequacies of Defendants' data security practices, Defendants were substantially certain that a failure to implement reasonable cybersecurity measures would lead to a data breach.

360. Defendants acted with a knowing state of mind when it permitted the Data Breach despite knowing their information security practices were inadequate, when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, and despite knowing that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

361. The Data Breach constitutes an intentional and reckless interference by Defendants with Plaintiffs' and Class Members' interests in solitude and seclusion, as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person— including but not limited to private medical information, diagnoses, and treatment records of Plaintiffs and Class Members.

362. Moreover, because of the frequent nature of data breaches, Defendants were substantially certain that a failure to protect the Private Information would lead to its disclosure

---

[61] *See* Wakefield Privacy Policy, https://wakeassoc.com/privacy-policy/.

to unauthorized third parties, including the thousands of waiting identity thieves who are in a special relationship to Plaintiffs and the proposed Class Members—in that those identity thieves are precisely the individuals whose aim it is to misuse such Private Information.

363. Defendants acted with a knowing state of mind when it permitted the Data Breach to occur, because it had actual knowledge that their information security practices were inadequate and insufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

364. Defendants acted with reckless disregard for Plaintiffs' and Class Members' privacy when it allowed improper access to their systems containing Plaintiffs' and Class Members' Private Information without protecting said data from the unauthorized disclosure or encrypting such information.

365. Because Defendants acted with this knowing state of mind, it had notice and knew that their inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class Members, of the kind that has occurred.

366. As a direct and proximate result of Defendants' acts and omissions set forth above, Plaintiffs' and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer injuries and damages including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) emotional distress due to their Private Information's publication on the dark web; (e) existing misuse of their Private Information in the form of fraud, identity theft, and increased, unwanted spam communications; and (f) the continued and certainly increased risk to their Private Information,

which remains in Defendants' possession in unencrypted form and subject to further unauthorized disclosures, so long as Defendants fails to undertake appropriate and adequate measures to protect it.

367. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as representatives of the Class and their counsel as Class Counsel;

(b) For an order declaring that Defendants' conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For damages in amounts to be determined by the Court and/or jury;

(e) For an award of statutory damages or penalties to the extent available;

(f) For pre-judgment interest on all amounts awarded;

(g) For an order of restitution and all other forms of monetary relief; and

(h) Such other and further relief as the Court deems necessary and appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: January 23, 2026

By: /s/Grayson Wells
J. Gerard Stranch, IV
Grayson Wells
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Gary M. Klinger
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Interim Co-Lead Class Counsel*

Raina Borrelli*
**STRAUSS BORELLI PLLC**
One Magnificent Mile
980 N Michigan Ave, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Sabita J. Soneji*

**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
ssoneji@tzlegal.com

Gary E. Mason
Danielle L. Perry
Lisa A. White
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
Email: gmason@masonllp.com
Email: dperry@masonllp.com
Email: lwhite@masonllp.com

Sean Short
Arkansas Bar No. 2015079
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, TX 77006
Tel: (888) 350-3931
sshort@eksm.com
service only: service@eksm.com

Casondra R. Turner
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
Tel: (866) 252-0878
cturner@milberg.com

Gary F. Lynch (PA 56887)
**LYNCH CARPENTER, LLP**
1133 Penn Ave, 5th Floor
Pittsburgh, PA 15222
T: 412-322-9243
gary@lcllp.com

Gerald D. Wells, III*
**LYNCH CARPENTER, LLP**
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910

F: 267-609-6955
jerry@lcllp.com

*Additional Plaintiffs' Counsel*

**Application for admission forthcoming*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

The undersigned counsel certifies that generative artificial intelligence was not used to draft this filing.

Dated: January 23, 2026

*/s/ Grayson Wells*
Grayson Wells

## CERTIFICATE OF SERVICE

The undersigned attorney of record hereby certifies that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: January 23, 2026

*/s/ Grayson Wells*
Grayson Wells

# COMPOSITE EXIBIT A

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMO86000911329
RENARDO LYNELL RISPER
[redacted]

November 7, 2025

PMO860009113291132901O2R0400

**NOTICE OF SECURITY INCIDENT**

Dear Renardo Lynell Risper:

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm for clients, including Novant Health, Inc.. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information. While we are unaware of any actual or attempted misuse of your information, we are providing you with information about the incident, our response, and steps you may take to better protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. We immediately took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to determine whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2025 and we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name and the following types of information were involved in this incident: Date of Birth, Social Security Number. Please note, we are not aware of any identity theft or fraud as a result of this incident and are notifying you out of an abundance of caution.

**What We Are Doing.** We take this incident and the security of information in our care very seriously. Upon becoming aware of this incident, we immediately took steps to confirm the security of our environment. We reviewed existing security policies and implemented additional measures to further protect against similar incidents moving forward. We reported this incident to law enforcement and regulators.

As an added precaution, we are offering you immediate access to complimentary credit monitoring and identity theft protection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion company. You can find information on how to enroll in these services in the enclosed with this letter. We encourage you to consider enrolling in these services as we are not able to do so on your behalf.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits, and monitoring your free credit reports for suspicious activity and to detect errors. Please also review the information contained in the enclosed "*Steps Individuals Can Take to Help Protect Personal Information*". You may enroll in the complimentary identity monitoring services we are offering.

Redacted

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMO86000103304
AARON HANSON
[redacted]

PMO860001033040330401024040O

November 7, 2025

**NOTICE OF SECURITY INCIDENT**

Dear Aaron Hanson:

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm for clients. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information. While we are unaware of any actual or attempted misuse of your information, we are providing you with information about the incident, our response, and steps you may take to better protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. We immediately took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to determine whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2025 and we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name and the following types of information were involved in this incident: Client ID or Client Number, Date of Birth, Health Information, Dates of Service. Please note, we are not aware of any identity theft or fraud as a result of this incident and are notifying you out of an abundance of caution.

**What We Are Doing.** We take this incident and the security of information in our care very seriously. Upon becoming aware of this incident, we immediately took steps to confirm the security of our environment. We reviewed existing security policies and implemented additional measures to further protect against similar incidents moving forward. We reported this incident to law enforcement and regulators.

As an added precaution, we are offering you immediate access to complimentary credit monitoring and identity theft protection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion company. You can find information on how to enroll in these services in the enclosed with this letter. We encourage you to consider enrolling in these services as we are not able to do so on your behalf.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits, and monitoring your free credit reports for suspicious activity and to detect errors. Please also review the information contained in the enclosed "*Steps Individuals Can Take to Help Protect Personal Information*". You may enroll in the complimentary identity monitoring services we are offering.

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMO86000103605
BRANDY R STEWART
[redacted]

Nc

**NOTICE OF SECURITY INCIDENT**

*Dear Brandy R Stewart:*

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm fo the normal services Wakefield provides, Wakefield receives information from its clients and is aware of an incident involving this information. While we are unaware of any actual or attem information, we are providing you with information about the incident, our response, and steps yo protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to c immediately took steps to secure our environment and launched an investigation to determine th the activity. The investigation determined there was unauthorized access and/or acquisition of c network on or before January 17, 2025. As a result, Wakefield began an extensive review of th whether they contained sensitive information and to which client of Wakefield the information r

**What Information Was Involved?** Our review and investigation was complete on or about S we notified potentially impacted clients of this incident. Wakefield is notifying you now beca following types of information were involved in this incident: Client ID or Client Number Information, Dates of Service. Please note, we are not aware of any identity theft or fraud as and are notifying you out of an abundance of caution.

We take this incident and the security of information in our c

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMO86000411020
CESAR LOPEZ
[redacted]

November 7, 2025

NOTICE OF SECURITY INCIDENT

Dear Cesar Lopez:

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm for clients, including Novant Health, Inc.. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information. While we are unaware of any actual or attempted misuse of your information, we are providing you with information about the incident, our response, and steps you may take to better protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. We immediately took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to determine whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2025 and we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name and the following types of information were involved in this incident: Date of Birth, Social Security Number, Health nformation. Please note, we are not aware of any identity theft or fraud as a result of this incident and are notifying ou out of an abundance of caution.

**Vhat We Are Doing.** We take this incident and the security of information in our care very seriously. Upon ecoming aware of this incident, we immediately took steps to confirm the security of our environment. We reviewed isting security policies and implemented additional measures to further protect against similar incidents moving rward. We reported this incident to law enforcement and regulators.

an added precaution, we are offering you immediate access to complimentary credit monitoring and identity theft tection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion company. You can d information on how to enroll in these services in the enclosed with this letter. We encourage you to consider olling in these services as we are not able to do so on your behalf.

**at You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing r account statements, explanation of benefits, and monitoring your free credit reports for suspicious activity and to ct errors. Please also review the information contained in the enclosed "*Steps Individuals Can Take to Hel ect Personal Information*". You may enroll in the complimentary identity monitoring services we are offering.

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMO85R00B00441
JANICE TERRI POTTER
[redacted]

November 7, 2025

**NOTICE OF SECURITY INCIDENT**

Dear Janice Terri Potter:

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm for clients, including Novant Health, Inc.. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information. While we are unaware of any actual or attempted misuse of your information, we are providing you with information about the incident, our response, and steps you may take to better protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. We immediately took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to determine whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2025 and we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name and the following types of information were involved in this incident: Client Name, Client ID or Client Number, Date of Birth, Social Security Number, Health Information, Dates of Service, National Provider ID. Please note, we are not aware of any identity theft or fraud as a result of this incident and are notifying you out of an abundance of caution.

**What We Are Doing.** We take this incident and the security of information in our care very seriously. Upon becoming aware of this incident, we immediately took steps to confirm the security of our environment. We reviewed existing security policies and implemented additional measures to further protect against similar incidents moving forward. We reported this incident to law enforcement and regulators.

As an added precaution, we are offering you immediate access to complimentary credit monitoring and identity theft protection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion company. You can find information on how to enroll in these services in the enclosed with this letter. We encourage you to consider enrolling in these services as we are not able to do so on your behalf.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits, and monitoring your free credit reports for suspicious activity and to detect errors. Please also review the information contained in the enclosed "*Steps Individuals Can Take to Help Protect Personal Information*". You may enroll in the complimentary identity monitoring services we are offering.

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMO86000703774
KEVIN BRIAN CURRY
[redacted]

PMO86000703774037740102E0400

November 7, 2025

**NOTICE OF SECURITY INCIDENT**

Dear Kevin Brian Curry:

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm for clients, including Novant Health, Inc.. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information. While we are unaware of any actual or attempted misuse of your information, we are providing you with information about the incident, our response, and steps you may take to better protect against the possibility of identity theft and fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. We immediately took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access and/or acquisition of certain files within our network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to determine whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2025 and we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name and the following types of information were involved in this incident: Date of Birth, Social Security Number. Please note, we are not aware of any identity theft or fraud as a result of this incident and are notifying you out of an abundance of caution.

**What We Are Doing.** We take this incident and the security of information in our care very seriously. Upon becoming aware of this incident, we immediately took steps to confirm the security of our environment. We reviewed existing security policies and implemented additional measures to further protect against similar incidents moving forward. We reported this incident to law enforcement and regulators.

As an added precaution, we are offering you immediate access to complimentary credit monitoring and identity theft protection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion company. You can find information on how to enroll in these services in the enclosed with this letter. We encourage you to consider enrolling in these services as we are not able to do so on your behalf.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits, and monitoring your free credit reports for suspicious activity and to detect errors. Please also review the information contained in the enclosed "*Steps Individuals Can Take to Help Protect Personal Information*". You may enroll in the complimentary identity monitoring services we are offering.

Wakefield & Associates
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

PMOB6000502796
DANIEL A STONE
[redacted]

November 7, 2025

**NOTICE OF SECURITY INCIDENT**

Dear Daniel A Stone:

Wakefield & Associates, LLC ("Wakefield") is a revenue cycle and collections consulting firm for clients, including MedQuest Associates, Inc., dba MedQuest Imaging. As part of the normal services Wakefield provides, Wakefield receives information from its clients and is writing to make you aware of an incident involving this information While we are unaware of any actual or attempted misuse of your information, we are providing you with informatio about the incident, our response, and steps you may take to better protect against the possibility of identity theft a fraud, should you feel it is necessary to do so.

**What Happened?** Earlier this year, Wakefield discovered suspicious activity related to certain systems. immediately took steps to secure our environment and launched an investigation to determine the nature and sco the activity. The investigation determined there was unauthorized access and/or acquisition of certain files withi network on or before January 17, 2025. As a result, Wakefield began an extensive review of these files to dete whether they contained sensitive information and to which client of Wakefield the information related.

**What Information Was Involved?** Our review and investigation was complete on or about September 24, 2 we notified potentially impacted clients of this incident. Wakefield is notifying you now because your name following types of information were involved in this incident: Date of Birth, Social Security Numbe Information. *Please note, we are not aware of any identity theft or fraud as a result of this incident and are ou out of an abundance of caution.*

***hat We Are Doing.*** *We take this incident and the security of information in our care very ser* oming aware of this incident, we immediately took steps to confirm the security of our environment. sting security policies and implemented additional measures to further protect against similar inci ward. We reported this incident to law enforcement and regulators.

an added precaution, we are offering you immediate access to complimentary credit monitoring and tection services for twelve (12) months at no cost to you, through Cyberscout, a TransUnion com d information on how to enroll in these services in the enclosed with this letter. We encourage y olling in these services as we are not able to do so on your behalf.

**hat You Can Do.** We encourage you to remain vigilant against incidents of identity theft and frau r account statements, explanation of benefits, and monitoring your free credit reports for suspiciou ct errors. Please also review the information contained in the enclosed "*Steps Individuals Ca ect Personal Information*". You may enroll in the complimentary identity monitoring services we