**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

| | |
|---|---|
| CESAR LOPEZ, JANICE POTTER, BRYAN SMITH, KEVIN CURRY, DANIEL STONE, AARON HANSON, BRANDY STEWART, and RENDARDO RISPER, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>WAKEFIELD & ASSOCIATES, LLC and REVCO SOLUTIONS, INC.,<br><br>    Defendants. | **Case No.: 1:25-cv-02937-CYC** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION
<u>COMPLAINT</u>**

Plaintiffs bring this action to redress Defendants' failure to safeguard highly sensitive personal and health information entrusted to them, resulting in a preventable data breach, delayed notification, and ongoing harm to Plaintiffs and the proposed Class. Defendants, through their Motion to Dismiss [ECF No. 54] ("Motion"), seek dismissal by disputing factual allegations, minimizing Plaintiffs' injuries, and narrowing applicable legal standards. At this stage, however, the Court must accept Plaintiffs' well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. Under that standard, Plaintiffs plausibly allege standing and state viable claims against both Defendants. The Motion should be denied in its entirety.

## FACTUAL BACKGROUND

Defendant Wakefield & Associates, LLC ("Wakefield") is a consulting firm that assists healthcare providers with revenue cycle and collections operations. Second Amended Consolidated Class Action Complaint [ECF No. 44] ("SAC") ¶ 29. As part of its business, Wakefield receives and maintains sensitive Private Information belonging to current and former patients of its healthcare-provider clients. *Id.* ¶ 30. Wakefield agreed to safeguard that data in accordance with its internal policies, state law, and federal law. *Id.* Wakefield's own Privacy Policy promised that it would "take precautions to ensure the security of your data in compliance with all applicable laws," including through "physical, electronic, and procedural safeguards." *Id.* ¶ 31.

Despite those representations, Wakefield failed to implement reasonable cybersecurity safeguards and policies to protect the Private Information in its possession. *Id.* ¶ 32. Among other failures, Wakefield failed to: properly supervise its IT and data security agents and employees, require multi-factor authentication, encrypt data at rest and in transit, monitor its systems for unusual activity or large data transfers, and require regular password changes. *Id.* ¶¶ 32–34. Indeed, given the few facts Defendant has allowed into the public sphere at this point, it is reasonable to

1

infer that Defendant lacked basic and expected cybersecurity measures appropriate to monitor its systems for intrusion. *Id.* ¶¶ 33, 39 (alleging a lack of appropriate monitoring tools to stop hackers from taking a substantial quantum of data, including Social Security numbers). These failures left Wakefield's systems vulnerable to cybercriminals and resulted in the exfiltration of Plaintiffs' and Class Members' sensitive personal and health information (the "Private Information"). *Id.* ¶ 35.

On or about November 7, 2025, Wakefield began sending notice letters informing affected individuals that it had "discovered suspicious activity related to certain systems." *Id.* ¶ 36. Wakefield's investigation revealed that there was "unauthorized access and/or acquisition of certain files" within its network on or before January 17, 2025. *Id.* Wakefield waited nearly ten months after the breach before notifying affected individuals. *Id.* ¶¶ 5–6, 36, 38, 49. The information accessed in the Data Breach included names, client IDs, dates of birth, Social Security numbers, health information, dates of service, and national provider identifiers. *Id.* ¶ 37. Plaintiffs further allege that Wakefield maintained additional categories of Private Information, including medical account details, account balances, driver's license and state identification numbers, financial account information, email addresses, and medical insurance information. *Id.*

The Data Breach was carried out by notorious cybercriminal groups, including the Akira ransomware group, which claimed responsibility for the attack and the theft of 13 GB of data, including Social Security numbers, passport numbers, licenses, agreements, payment reports, internal email and correspondence, medical insurance documentation, and Medicare numbers. *Id.* ¶ 39. Later, a second cybercriminal group, Coinbase Cartel, also listed Wakefield on its dark web site with a repository link of Wakefield data. *Id.* ¶ 40. Plaintiffs further allege that Wakefield lacked reasonable authentication practices, including secure password protocols, which facilitated unauthorized access to its systems. *Id.* ¶¶ 42–43. As alleged, the Data Breach was foreseeable and

2

preventable, had Wakefield implemented basic cybersecurity measures. *Id.* ¶ 44.

Because of Defendants' failure to implement reasonable data security, Plaintiffs suffered concrete injuries from the Data Breach and the delayed notice. Plaintiff Lopez alleges that someone used his Social Security number to attempt to open a car loan in his name. *Id.* ¶ 71. Plaintiffs Potter, Curry, and Stone allege that their Private Information was found on the dark web after the Data Breach. *Id.* ¶¶ 86, 116, 131. Plaintiffs also suffered lost time, mitigation efforts, phishing communications, anxiety, emotional distress, invasion of privacy, and continuing risk of identity theft and fraud. *Id.* ¶¶ 74–80, 90–95, 119–24, 134–39, 164–73, 181–90, 198–207.

Finally, Plaintiffs allege that, in or about February 2025, Defendant Revco Solutions, Inc. ("Revco") publicly announced a strategic merger with Wakefield, and that the resulting organization would operate under the Revco Solutions name. *Id.* ¶¶ 59–60. Plaintiffs further allege that, following the announced merger, Revco exercised involvement in or control over at least certain Wakefield operations, including consumer-facing functions related to payments, account servicing, and communications after the Data Breach. *Id.* ¶¶ 62–64. Thus, Revco appears to have acquired all aspects of Wakefield's business, including its liabilities.

## LEGAL STANDARD

When considering a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). Rule 8(a)(2) requires only a short and plain statement showing that the pleader is entitled to relief and giving defendants fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[S]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Lane v.*

3

*Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007). A complaint need not contain detailed factual allegations; it must allege enough facts, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim survives even if it is "improbable" a plaintiff will be able to prove those facts or the odds of recovery are "remote and unlikely." *Id*. at 679 (citing *Twombly*, 550 U.S. at 556). The Court must liberally construe the pleadings. *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002).

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint." C*hipotle Mexican Grill, Inc. v. Chevedden*, No. 14-CV-0018-WJM-KMT, 2014 WL 1004529, at *1 (D. Colo. Mar. 14, 2014)). When, as here, defendants facially challenge the sufficiency of the allegations, the Court must accept Plaintiffs' well-pleaded allegations as true. *See S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013). At the pleading stage, Plaintiffs need only plausibly allege facts supporting injury, traceability, and redressability. Defendants' disagreement with Plaintiffs' factual allegations, or their attempt to draw competing inferences from those allegations, does not warrant dismissal.

## ARGUMENT

### I.    PLAINTIFFS HAVE ARTICLE III STANDING.

Plaintiffs allege concrete and particularized injuries that more than satisfy the threshold for Article III standing. Standing exists where plaintiffs suffer an injury in fact that is fairly traceable to the defendant's misconduct and where the injury is redressable by the Court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Under Article III, a "harm" or injury establishes standing if it constitutes "an invasion of a legally protected interest" that is "concrete and particularized" and not "conjectural or hypothetical." *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560 (1992). The injury must also be "actual or imminent." *Spokeo*, 578 U.S. at 338. A plaintiff's injuries need not be

4

"tangible" to be concrete: "Various intangible harms can also be concrete . . . Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Plaintiffs also need not allege that they suffered a harm "traditionally recognized" under the law because even an injury with a "close relationship" to a harm suffices under Article III. *Id*.

Defendants essentially argue that because Plaintiffs are victims of a data breach, they lack standing—but this argument runs contrary to binding precedent establishing that where a plaintiff's private information is exposed in a harmful manner, standing exists. *TransUnion*, 594 U.S. at 432-33 (holding that class members whose credit reports were disseminated to third parties suffered a "concrete injury"). Indeed, the burden of showing standing is not high. At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" because there is a presumption that such general allegations are based on specific facts necessary to support the claim. *Lujan*, 504 U.S. at 561. The vast and significant injuries Plaintiffs allege in the Complaint—which include fraudulent loan applications, expenses to enroll in credit monitoring, alerts that their Private Information was published on the dark web after the Data Breach, an onslaught of invasive spam communications using their compromised data, loss of privacy, anxiety and stress, and countless hours spent dealing with the fallout of the Data Breach[1]—are more than enough to satisfy Article III standing. *Maser v. Commonspirit Health*, No. 1:23-CV-01073-RM-SBP, 2024 WL 2863579, at \*6 (D. Colo. Apr. 16, 2024) ("[C]ases that involve targeted breaches, fraud-sensitive data, and actual misuse (as to at least one named plaintiff) easily meet the Article III standing requirement at the pleading phase."); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 969 (7th Cir. 2016) (Because "at least some of the injuries [Plaintiffs]

---

[1] SAC ¶¶ 71-76, 86-93, 105-107, 119-22, 134-37, 164-70, 181-83 & 199-204.

allege here qualify as immediate and concrete injuries," the case should proceed to discovery).

### A. Plaintiffs Allege Cognizable Injuries in Fact.

#### 1. *Allegations of actual or attempted fraud or identity theft confer standing.*

Although the Tenth Circuit Court of Appeals has yet to issue a decision addressing standing in data breach cases, courts throughout the country and within the Tenth Circuit have repeatedly held that where a plaintiff's private information is misused to commit or attempt to commit fraud or identity theft, such misuse is a concrete injury that confers standing. *See*, *e.g.*, *C.C. v. Med-Data Inc.*, No. 21-2301-DDC-GEB, 2022 WL 970862, at *4 (D. Kan. Mar. 31, 2022) (citing cases that fraudulent charges and unauthorized account access are concrete, present injuries); *F.S. v. Captify Health, Inc.*, No. 23-1142-DDC-BGS, 2024 WL 1282437, at *3-4 (D. Kan. Mar. 26, 2024) (citing cases to show that virtually all courts find actual misuse of information to be a concrete injury); *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 (11th Cir. 2023) (misuse "constitutes both a 'present' injury and a 'substantial risk' of harm in the future.").

Here, Plaintiff Lopez was contacted by a car dealership after the Data Breach to complete a loan application initiated using his Social Security number and other Private Information. SAC ¶ 71. Defendants desperately try to argue this is not a real injury because Plaintiff Lopez did not allege a litany of specific details not required by any case law or federal rule. Plaintiff Lopez alleged experiencing attempted fraud or identity theft after the Data Breach in the form of an unauthorized loan application—no additional harm is required to confer standing. *See, e.g.*, *Lewert*, 819 F.3d at 965 (finding standing where plaintiffs alleged fraudulent charges after the breach even though the charges were stopped); *Legg v. Leaders Life Insurance Company*, 574 F.Supp.3d 985, 990 (W.D. Okla. 2021) (citing cases to show that standing is conferred where a named plaintiff experiences "attempted fraud"); *In re Arby's Rest. Grp. Inc. Litig.*, 2018 WL

2128441, at *3 (N.D. Ga. Mar. 5, 2018) (alleged actual and attempted misuse of stolen PII, and "theft of their personal financial information, and costs associated with detection and prevention of identity theft—are sufficient to survive a motion to dismiss."). Courts in this circuit have rejected Defendants' attempt to impose unreasonable injury requirements because "[a]n injury for the purpose of Article III standing is not limited to financial harm" *Masterson v. IMA Fin. Grp., Inc.*, No. 223CV02223HLTADM, 2023 WL 8647157, at *4, n.4 (D. Kan. Dec. 14, 2023); *TransUnion LLC*, 594 U.S. at 417, 432 ("Various intangible harms" can also be concrete.).

Thus, Plaintiffs and the Class have standing to pursue damages and injunctive relief, as explained below. *See Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693-94 (7th Cir. 2015) (finding standing for the entire class where some class members experienced fraudulent charges).

### 2. *Imminent risk of fraud and identity theft confers standing.*

Where there are "plausible allegations of actual misuse by some Plaintiffs, and making reasonable inferences in favor of Plaintiffs, the remaining named Plaintiffs' injury is plausibly imminent and substantial for pleading purposes." *In re Progressive Leasing Breach Litig.*, No. 2:23-cv-00783-DBB-CMR, 2025 WL 213744, at *13 (D. Utah Jan 16., 2025) ("*Progressive*"). In other words, even for the plaintiffs who have not yet experienced actual misuse or disclosure of their data on the dark web, they "plausibly pled a higher likelihood that their own PII will be misused because cybercriminals already have misused other PII in the same dataset." *Id.* Courts across the country have reached the same conclusion and repeatedly conferred standing on the entire class where some named plaintiffs experienced actual or attempted fraud or misuse of their breached information. *See, e.g., Remijas*, 794 F.3d at 693-94 (finding that the data breach had placed the plaintiffs at a "substantial risk" of identity theft and credit card fraud where some of the class members had already experienced fraudulent charges); *Green-Cooper*, 73 F.4th at 889

7

(misuse "constitutes both a 'present' injury and a 'substantial risk' of harm in the future."); *Captify Health, Inc.*, 2024 WL 1282437, at \*4 ("Misuse also shows 'an increased risk of identity theft or identify fraud' in the future.") (citation omitted); *Maser*, 2024 WL 2863579, at \*6 ("[C]ases that involve targeted breaches, fraud-sensitive data, and actual misuse (as to at least one named plaintiff) easily meet the Article III standing requirement at the pleading phase."); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1263 (11th Cir. 2021) ("[T]he allegations of some Plaintiffs that they have suffered injuries resulting from actual identity theft support the sufficiency of all Plaintiffs' allegations that they face a risk of identity theft."). Thus, because Plaintiff Lopez alleges that he suffered attempted fraud and identity theft using his Private Information following the Data Breach, and other Plaintiffs have experienced various forms of misuse such as targeted phishing communications, the entire Class now faces an imminent and substantial risk of fraud and identity theft, sufficient to confer standing.

Moreover, Plaintiffs' most sensitive information was stolen: their Social Security numbers, health information, driver's license and state ID numbers, passport numbers, financial account information, and more. SAC ¶¶ 37-39. Such information is often targeted and sold on the dark web for its high value to criminals. *Id.* ¶¶ 223-26 ("Medical records are a gold mine for criminals . . ."); *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 272 (S.D.N.Y. Mar. 8, 2021) (noting that Social Security numbers are arguably "the most dangerous type of personal information in the hands of identity thieves"). As a result, numerous courts have concluded that when information with high fraud potential is stolen, the likelihood of future fraud or identity theft is objectively imminent. *See Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 387–91 (6th Cir. 2016) (finding standing because where "data breach targets personal information, a reasonable inference can be drawn that the hackers will use the victims' data for . . . fraudulent purposes"); *Captify*

8

*Health, Inc.*, 2024 WL 1282437, at \*5 ("'Naturally, the dissemination of high-risk information such as Social Security numbers and dates of birth— especially when accompanied by victims' names—makes it more likely that those victims will be subject to future identity theft or fraud.'") (citation omitted); *Sweet v. BJC Health System*, No. 3:20-CV-00947-NJR, 2021 WL 2661569, at \*4 (S.D. Ill. June 29, 2021) (finding standing because "information such as dates of birth, Social Security numbers, and addresses would likely be sufficient to permit identity theft"); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir. 2021) ("Given the colossal amount of sensitive data stolen, including Social Security numbers, names, and dates of birth, and the unequivocal damage that can be done with this type of data, we have no hesitation in holding that Plaintiffs adequately alleged that they face a 'material' and 'substantial' risk of identity theft that satisfies the concreteness and actual-or-imminent elements."). Plaintiffs' allegations of imminent risk of harm sufficiently show standing.

### 3. *Allegations of Dark Web Posting Plausibly Plead Both a Present and Imminent Injury Sufficient to Establish Standing.*

Further, here, *two* different cybercriminal groups posted on the dark web that they had obtained the Private Information from Defendants' systems, which included a repository link of the private data. SAC ¶¶ 39-40. And all Plaintiffs believe that their Private Information was listed on the dark web after the Data Breach, and Plaintiffs Potter, Curry, and Stone have received notifications confirming so. *Id.* ¶¶ 69, 85-86, 100, 114-16, 129-31. This additional factor of dissemination of their Private Information on the dark web increases the likelihood that Plaintiffs and the Class Members will suffer fraud and identity theft. *Green-Cooper*, 73 F.4th at 890 (finding that plaintiffs' allegations "that their credit card and personal information was exposed for theft and sale on the dark web . . . establishes both a present injury—credit card data and personal information floating around on the dark web—and a substantial risk of future injury—future

misuse of personal information associated with the hacked credit card") (internal quotation marks omitted); *Fero v. Excellus Health Plan, Inc.*, 304 F. Supp. 3d 333, 340-45 (W.D.N.Y. 2018) (court's determination that the plaintiffs were subject to imminent and certain impending injury buttressed by evidence that the plaintiffs' information was for sale on the dark); *Krupa v. TIC Int'l Corp.*, 2023 WL 143140, at *2 (S.D. Ind. Jan. 10, 2023) ("There is a common-sense expectation—which Defendant implicitly recognizes through its attempts at data security—that social security numbers 'are best kept private and that their exposure to hackers is a harm (whether or not identity theft has yet occurred.'"); *Progressive*, 2025 WL 213744, at *11 ("[A]llegations that the plaintiffs' PII was available for sale on the Dark Web following a data breach—and could therefore be purchased by cybercriminals at any moment to commit identity theft or fraud—provide[s] strong support for the conclusion that those plaintiffs had established an Article III injury in fact."). Accordingly, Plaintiffs' allegations of dark web posting sufficiently plead injury for purposes of Article III.

### 4. *Targeted and suspicious spam communications establish standing.*

The surge in targeted and suspicious phishing calls, text messages, and emails Plaintiffs suffered after the Data Breach is also a misuse of their information and confers standing for an injury in fact. SAC ¶¶ 75, 91, 105, 120, 135. Courts nationwide have repeatedly concluded that unwanted spam and phishing communications after a data breach establish Article III standing. *See, e.g.*, *In re Flagstar Dec. 2021 Data Sec. Incident Litig.*, No. 22-cv-11385, 2024 WL 5659583, at *5 (E.D. Mich. Sep. 30, 2024) ("Increases in the number of scam and phishing calls, texts, and emails are cognizable injuries."); *In re LastPass Data Sec. Incident Litig.,* 742 F. Supp. 3d 109, 121 (D. Mass. July 30, 2024) (plaintiffs alleged standing via allegations of, *inter alia*, "increased phishing attempts and spam messages"); *Tate v. EyeMed Vision Care, LLC*, No. 1:21-cv-36, 2023 WL 6383467, at *5 (S.D. Ohio Sep. 29, 2023) (finding that spam communications after a data

breach "annoy, harass, and, in the case of phone calls, temporarily claim control over an individual's personal device" which "constitute cognizable Article III injuries in fact"); *Baldwin v. Nat'l W. Life Ins. Co.*, 2021 WL 4206736 at \*4 (W.D. Mo. Sep. 15, 2021) ("[T]his Court finds that the allegations of spam phone calls and emails can qualify as an injury to support Plaintiffs' claims."). This Court should accordingly conclude that such injuries here confer standing.

### 5.    *Loss of privacy and diminished value of information confer standing.*

To determine whether a harm is sufficiently concrete for purposes of Article III, courts "assess whether the alleged injury . . . has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (observing that disclosure of private information exemplifies a common-law analogue for a concrete harm); (quoting *Spokeo*, 578 U.S. at 341)). Virtually all American courts recognize a right to privacy. *See, e.g., Dickson v. Direct Energy, LP*, 69 F.4th 338, 345-48 (6th Cir. 2023) (holding that a ringless, unwanted voicemail is analogous to the tort of intrusion upon seclusion and is therefore a concrete injury); *TransUnion*, 594 U.S. at 425 ("Various intangible harms can also be concrete . . . . Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion."); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1221 (10th Cir. 2003) ("[A]n intrusion occurs when an actor believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act.").

Here, Plaintiffs allege a loss of privacy based on the unauthorized access to and theft of their Private information and the public disclosure of that information. SAC ¶¶ 72, 88, 102, 117, 132, 170, 187, 204. Courts easily find standing in data breach cases under these circumstances, including in the Tenth Circuit. *See Medoff v. Minka Lighting, LLC*, 2023 WL 4291973, at \*3 (C.D. Cal. May 8, 2023) ("[C]ourts across the country have held that the invasion of a plaintiff's privacy

11

interest that occurred as a result of the theft of their PII is a concrete injury that establishes Article III standing."); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155, 157–58 (3d Cir. 2022) ("[I]f the theory of injury is an unauthorized exposure of personally identifying information that results in an increased risk of identity theft or fraud, that harm is closely related to that contemplated by privacy torts that are 'well-ensconced in the fabric of American law.'") (citation omitted); *Dancel v. Groupon, Inc.*, 2018 WL 11195080, at *2 (N.D. Ill. Oct. 10, 2018) ("[T]he dissemination to a third party of information in which a person has a right to privacy is a sufficiently concrete injury for standing purposes."); *Progressive*, 2025 WL 213744, at *11 ("[T]he publication of Plaintiffs' PII on the dark web is akin to disclosure of private information, which the Supreme Court specifically recognized as a concrete intangible harm.").

Moreover, Plaintiffs have suffered a concrete injury from the diminished value of their Private Information. SAC ¶¶ 73, 89, 103, 118, 133, 171, 188, 205. Defendants' argument that this fails to establish an injury is simply incorrect. The Data Breach "devalued Plaintiffs' PII by interfering with their fiscal autonomy" and "potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace." *In re Eureka Casino Breach Litig.*, 2024 WL 4253198, at *5 (D. Nev. Sept. 19, 2024). Thus, when a person's Private Information is taken by cybercriminals and exposed on the dark web, actual diminution in value occurs preventing them from transacting as needed with credit. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 461-62 (D. Md. 2020). As such, "the growing trend across courts that have considered this issue is to recognize the lost property value of this information." *Id.*; *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1204 (S.D. Fla. 2022) (finding lost value in information cognizable); *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *15 (N.D. Cal. May 27, 2016) (same); *In re Pawn Am. Consumer Data Breach Litig.*,

12

2022 WL 3159874, at *3 (D. Minn. Aug. 8, 2022) (finding that publication of private information, "much of whose value derives from the fact that it is private," to a third party in a data breach was "sufficient to establish standing").

### 6. *Anxiety and stress confer standing.*

All Plaintiffs allege experiencing fear, anxiety, and stress, as a result of the Data Breach and imminent misuse of their Private Information. SAC ¶¶ 77-78, 92-93, 106-7, 121-22, 136-37, 166-69, 186, 200-03. Contrary to Defendants' argument, the Supreme Court of the United States has confirmed that the risk of future harm, coupled with "emotional injury," can suffice to demonstrate Article III standing. *TransUnion,* 594 U.S. at 437. Since *TransUnion*, courts considering allegations like Plaintiffs' in similar data breach cases have repeatedly found that allegations of emotional and mental harm confer standing. *Progressive*, 2025 WL 213744, at *9 (finding that emotional distress can be a concrete injury that results from imminent misuse of one's personal information); *Briggs v. N. Highland Co.*, 2024 WL 519722, at *6 (N.D. Ga. Feb. 9, 2024) ("Plaintiff's allegations that his knowledge of the substantial risk of identity theft causes him to presently experience emotional distress satisfies the standing inquiry."); *Clemens*, 48 F.4th at 156 (Emotional distress is a concrete injury if a "plaintiff's knowledge of the substantial risk of identity theft causes him to presently experience emotional distress or spend money on mitigation measures like credit monitoring services."); *Maser*, 2024 WL 2863579 at *6 ("[I]f a data breach plaintiff satisfies the *intentionality* and *financial-sensitivity* factors, courts will generally find standing even when the only alleged harms are a future risk and present anxiety or mitigation expense."); *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 283 (2d Cir. 2023) (finding that because the risk of identity theft or fraud was imminent, emotional distress constitutes a concrete injury). Thus, Plaintiffs' allegations of anxiety and stress establish an injury-in-fact.

13

     **7.**     ***Lost time and money mitigating the effects of the Data Breach confer
standing.***

All Plaintiffs also have standing because they each allege losing significant time and/or
money to mitigate the effects of the Data Breach. *See, e.g.,* SAC ¶¶ 74-76 (Plaintiff Lopez forced
to spend time dealing with the fraudulent attempt to open a loan with his name and SSN); ¶ 86
(Plaintiff Potter spending $19.99 monthly for Experian credit monitoring as a result of the breach
and alerted by Experian that her Private Information was on the dark web); ¶¶ 90-91 (Plaintiff
Potter forced to spend time answering and resolving suspicious spam calls, enrolling in credit
monitoring, and reviewing her account statements per Defendant's Notice Letter); ¶¶ 104-05
(Plaintiff Smith losing time to monitor his credit and accounts and spending three hours each week
sorting through the onslaught of spam regarding unrecognized loan pre-approvals).

Colorado law has long recognized that plaintiffs suing in tort can recover damages for "time
and effort they expended" and "the inconvenience and interference with their ability to pursue their
hobbies" which properly "support[s] their claim for damages for annoyance and discomfort."
*Webster v. Boone*, 992 P.2d 1183, 1186 (Colo. App. 1999). Likewise, courts have repeatedly found
such expenditures of time and money after a data breach to constitute a separate injury in fact
because they were not manufactured but were necessitated by the actual or imminent misuse of the
plaintiffs' Private Information. *See Progressive*, 2025 WL 213744, at *13 ("Plaintiffs' allegations
based on time and money spent mitigating the risk of identity theft, fraud, and unauthorized use of
their PII sufficiently alleges a concrete injury. All named Plaintiffs therefore have plausibly pled
Article III standing for damages."); *Maser*, 2024 WL 2863579, at *6 (confirming that mitigation
expenses are an injury where, as here, the breach is targeted and financially-sensitive is taken);
*Remijas*, 794 F.3d at 692 (holding that plaintiffs' "lost time and money resolving fraudulent
charges" and "lost time and money protecting themselves against future identity theft" are concrete

injuries in fact); *Clemens*, 48 F.4th at 156 (finding a concrete injury when an imminent risk of future identity theft existed and "plaintiff's knowledge of the substantial risk of identity theft causes him to . . .spend money on mitigation measures like credit monitoring services"); *Roper v. Rise Interactive Media & Analytics, LLC*, 2023 WL 7410641 (N.D. Ill. Nov. 9, 2023) ("Plaintiffs' time spent monitoring and mitigating the harm from the breach is a separate injury in fact."). This Court should also find that Plaintiffs' mitigation efforts and expenses confer standing.

**B.      Plaintiffs' Injuries Are Fairly Traceable to Defendants' Conduct.**

The second element of standing—traceability—requires a plaintiff to "allege a substantial likelihood that the defendant's conduct caused [the] plaintiff's injury in fact." *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, N.M.*, 993 F.3d 802, 814 (10th Cir. 2021) (internal quotation and citation omitted) *cert. denied sub nom.*, 142 S. Ct. 1228 (2022). This does not require a plaintiff to allege that the defendant was the "proximate cause of its injury" or that "a 'defendant's actions are the very last step in the chain of causation.'" *Id.* (citations omitted); *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1333 (D. Kan. Aug. 20, 2018) "[T]he 'traceability' of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation."). "Rather, at the motion to dismiss stage, a plaintiff can satisfy the 'fairly traceable' requirement by advancing allegations which, if proven, allow for the conclusion that the challenged conduct is a 'but for' cause of the injury." *Santa Fe*, 993 F.3d at 814. Traceability presents a "relatively low burden" for a plaintiff to satisfy. *Spence v. Basic Research*, No. 2:16-cv-925-CW, 2017 WL 2416913, at *3, *10 (D. Utah June 2, 2017) (noting that the Tenth Circuit has determined that traceability "amounts to a considerably reduced burden" (internal quotation marks omitted)). Here, Plaintiffs satisfy this low standard.

Plaintiffs allege that they provided their Private Information to Defendants as a condition

15

of receiving medical services and that this Private Information included their full name, contact information, Social Security number, driver's license and other identification information, health information, and financial account information. *See* SAC ¶¶ 2, 37-39, 65, 81, 96, 110, 125, 157-8, 174-5, 191-2. Plaintiffs allege that Defendants stored their Private Information unencrypted in an unsecured repository, and that Defendants failed to protect this information when it allowed an unauthorized person to access the repository and exfiltrate Plaintiffs' and Class Members' Private Information stored therein. SAC ¶¶ 10, 316, 326. Indeed, Defendants admitted and notified its patients that the data breach resulted in unauthorized access and acquisition of their Private Information, which included their names, dates of birth, Social Security numbers, and health information, among other information. *Id.* ¶ 37. And two cybercriminal groups posted on the dark web that they had obtained the Private Information from Defendants' systems, even including a repository link of the data for others to purchase. *Id.* ¶¶ 39-40. Thus, it cannot reasonably be questioned that Defendants' conduct is a but-for cause of Plaintiffs' injuries.

Moreover, the harms occurred in the months following the Data Breach, affected several Plaintiffs, Plaintiffs' Private Information was found on the dark web, Plaintiffs are very careful about sharing their Private Information, and the misuse Plaintiffs suffered involved the precise information exfiltrated from Defendants' systems (*e.g.*, Social Security numbers and contact information). *See* SAC ¶¶ 73, 237-40, 286-91. These are the relevant factors that courts consider in finding traceability for standing. *See Progressive*, 2025 WL 213744, at *13 ("Applying all reasonable inferences in their favor" to find traceability satisfied for standing, considering Plaintiffs' allegations of temporal harm after their PII was uploaded to the dark web and where Plaintiffs were careful about sharing their PII); *Flores*, 242 N.E.3d at 352 (finding under similar circumstances that "Plaintiffs have set forth sufficient allegations to establish that the fraudulent

16

payments were fairly traceable to the data breach for the purposes of standing"); *In re Am. Fin. Res., Inc. Data Breach Litig.*, No. 2:22-cv-01757-MCA-JSA, 2023 WL 3963804, at *5 (D.N.J. Mar. 29, 2023) (Plaintiffs' allegations that their injuries "occurred as a result of the Defendant's failure to secure their PII is sufficient" to establish traceability); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("Even a showing that a plaintiff's injury is indirectly caused by a defendants' actions satisfies the fairly traceable requirement."). But for Defendants' failures to encrypt, redact, and secure the Private Information, Plaintiffs and the Class would not have been harmed. Thus, Plaintiffs have pled sufficient facts to show that their injuries are fairly traceable to Defendants' conduct.

### C.    Plaintiffs' Injuries Are Redressable by the Court.

The third element of standing, redressability, looks to whether the relief requested is likely to redress the injury. *Ash Creek Mining Co. v. Lujan*, 969 F.2d 868, 875 (10th Cir. 1992); *Spokeo*, 578 U.S. at 338. Here, Plaintiffs request relief that will address the harms caused by the Data Breach, such as damages to compensate them for the injuries sustained and injunctive relief that would require data encryption, deletion of their Private Information without a reasonable justification for its retention, maintaining a comprehensive information security program to protect the Private Information, employee training, and engaging auditors and personnel to run automated security monitoring. SAC ¶¶ 114-17. Courts routinely find that the harms suffered by Plaintiffs, including unauthorized account activity, increased solicitations, and heightened risk of future fraud are redressable by the damages and injunctive relief sought here. *See, e.g.*, *In re Zappos.com, Inc.*, 888 F.3d 1020, 1030 (9th Cir. 2018) (explaining that risk of identity theft could be redressed by damages and monitoring); *Smith v. Loyola University Med. Ctr.*, No. 23-cv-15828, 2024 WL 3338941, at *4 (N.D. Ill. Jul. 9, 2024) ("[P]laintiffs have adequately pleaded injury-in-fact based

17

on the alleged disclosure of their medical information that, at this stage, is sufficient to confer standing to seek both damages and injunctive relief"); *Progressive*, 2025 WL 213744, at *13 ("Plaintiffs' allegations based on time and money spent mitigating the risk of identity theft, fraud, and unauthorized use of their PII sufficiently alleges a concrete injury" for damages); *Med-Data Inc.*, 2022 WL 970862, at *6 ("'[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring. . . .'") (citing *TransUnion*, 549 U.S. at 435). Thus, Plaintiffs have standing.

## II.    PLAINTIFFS SUFFICIENTLY STATE EACH OF THEIR CLAIMS.

### A.    Choice of Law

As Defendant notes (Mot. at 18), Colorado applies the "most significant relationship" test to tort and contract claims, which involves considering the following factors: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 510 (Colo. 2007). However, "[w]hen more than one body of law may apply to a claim, the Court need not choose which body of law to apply unless there is an outcome determinative conflict between the potentially applicable bodies of law." *SELCO Cmty. Credit Union v. Noodles & Co.*, 267 F. Supp. 3d 1288, (D. Colo. 2017) (internal citation omitted). Here, Defendant does not identify any outcome-determinative conflict of laws. In any event, Plaintiffs allege Wakefield is organized under the laws of Colorado and headquartered in Colorado. SAC ¶ 24. As Defendants state, Plaintiffs allege Wakefield's decisions as to its data security policies and practices giving rise to Plaintiffs' claims ultimately emanated from Colorado. Therefore, at the motion to dismiss stage and based on the pleadings, Plaintiffs agree Colorado has the most

18

significant relationship with the claims for which Plaintiffs seek relief.

###### B.        Plaintiffs Plausibly Allege Claims Against Revco.

Defendants' request to dismiss Revco requires that the Court resolve fact-intensive questions about the legal effect of the Revco-Wakefield transaction before discovery. That is improper at the pleading stage. Plaintiffs allege that, in or about February 2025, Revco publicly announced a strategic merger with Wakefield and stated that the resulting organization would operate under the Revco Solutions name. SAC ¶¶ 59–60. Plaintiffs further allege that the precise terms of the merger or acquisition, including allocation of liabilities and operational responsibilities, have not been publicly disclosed. *Id.* ¶ 61. Those undisclosed facts are central to Revco's liability and are uniquely within Defendants' possession. Nevertheless, anyone going to Wakefield website to pay a bill at the time the complaint was filed was faced with an inoperable webpage because Revco had already taken over those functions. *Id.* ¶ 62.

Colorado recognizes the traditional rule that, when one company transfers assets to another, the successor is generally not liable for the transferor's debts and liabilities unless an exception applies. *Kloberdanz v. Joy Mfg. Co.*, 288 F. Supp. 817, 820 (D. Colo. 1968). Those exceptions include where "the purchaser expressly or impliedly agrees to assume such debts," where "the transaction amounts to a consolidation or merger," where "the purchasing corporation is merely a continuation of the selling corporation," or where "the transaction is entered into fraudulently in order to escape liability for such debts." *Id.*; *see also Hickman v. Thomas C. Thompson Co.*, 592 F. Supp. 1282, 1284 (D. Colo. 1984). Given the facts alleged here, it appears that Revco has fully acquired Wakefield through a merger and is essentially continuing its operations. SAC ¶¶ 59–60.

Defendants cite *Watson Family Trust v. Rockysoft Corp.* for the same general rule, but *Watson* is not dispositive here because it was decided on summary judgment after factual

development, not on a Rule 12 motion. *See Watson Family Trust v. Rockysoft Corp.*, No. 2017 CV 30462 (Colo. Dist. Ct. Larimer Cnty. Dec. 22, 2018).[2] Defendants specifically cite *Watson* to argue that Plaintiffs have not **proven** successor liability and frame Plaintiffs' theory as an attempt to impose liability on Revco only for Wakefield's "debts." ECF No. 50 at 19-20. Proof is not required from the Complaint and, at this stage, Plaintiffs need only allege facts supporting application of a recognized exception of facts requiring discovery into those exceptions so that they may be considered at a later case stage. *See generally Kloberdanz.*

Here, Plaintiffs seek to hold Revco responsible for injuries arising from the Data Breach, delayed notice, and Revco's post-merger involvement in Wakefield's operations, including payment processing, account servicing, and communications after the Data Breach—because Revco appears to have wholly subsumed Wakefield through a merger and is continuing its operations. SAC ¶¶ 59–64. So, Plaintiffs have plausibly alleged Revco's involvement and that multiple exceptions apply.

Defendants cannot demand more detail before discovery where the merger terms, allocation of liabilities, operational control, and Revco's knowledge are peculiarly within Defendants' possession. The facts necessary to determine whether Revco assumed liabilities, whether the transaction amounted to a merger or consolidation, whether Revco continued Wakefield's operations, and whether Revco ratified or controlled Wakefield's conduct are not publicly available and require discovery. Courts applying Tenth Circuit pleading standards permit allegations on information and belief in those circumstances. *Robison v. 7PN, LLC*, 569 F. Supp.

---

[2] Although the basis for that denial of the motion to dismiss is not discussed in the *Watson* opinion, the procedural posture underscores that successor liability typically involves fact-intensive inquiries—such as the nature of the transaction, continuity of operations, and allocation of liabilities—that are not appropriate for resolution on a Rule 12 motion.

3d 1175, 1181 (D. Utah 2021).

Likewise, Defendants' ratification argument is also premature. Defendants rely on *Liberty Mortgage*, but that case did not resolve ratification on bare pleadings. The Colorado Supreme Court reviewed a trial court's ruling after factual findings concerning the party's knowledge and conduct. *See Liberty Mortg. Corp. v. Fiscus*, 2016 CO 31, P.3d 278. That posture is critical. Whether Revco knew of Wakefield's conduct, accepted the benefits of Wakefield's operations, approved post-breach conduct, or assumed responsibility for affected consumer accounts turns on facts within Defendants' possession. Plaintiffs allege that Revco became involved in Wakefield's operations after the announced merger, including consumer-facing payment functions, account servicing, and communications after the Data Breach. SAC ¶¶ 62–64. Those allegations plausibly support ratification at this stage, and discovery will determine the extent of Revco's knowledge and approval.

Plaintiffs' group pleading is also proper, particularly at this stage of the litigation. Courts in this District recognize that collective allegations violate Rule 8 only where a complaint fails to distinguish among defendants in a way that deprives them of fair notice or improperly groups defendants whose alleged conduct is materially different. But courts also permit collective allegations where, based on the circumstances, it would be unreasonable to require a plaintiff to identify which specific defendant committed each act prior to discovery. *Carrado v. Daimler AG*, 2018 WL 4565562, at *3–4 (D. Colo. Sept. 24, 2018) (discussing *Bark v. Chacon*, 2011 WL 1884691 (D. Colo. May 18, 2011)). That is the case here. Plaintiffs identify Wakefield as the entity whose systems were breached and identify Revco as the entity that publicly announced the strategic merger with Wakefield, became the entity name after the merger, and became involved in Wakefield's payment, account servicing, and post-breach communications functions. SAC ¶¶

21

29–45, 59–64. Unlike cases where allegations are entirely different in character and improperly grouped, the allegations here arise from the same Data Breach and related conduct and reflect the alleged relationship between the Defendants. *Carrado*, 2018 WL 4565562, at *4 (distinguishing *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008)). At this stage, and before discovery, Plaintiffs are not required to allege with greater specificity which Defendant performed each act. The Complaint provides fair notice and plausibly alleges a basis for liability as to Revco, satisfying Rule 8. Thus, Plaintiffs plausibly allege claims against Revco under direct, successor, agency, ratification, and vicarious liability theories.

### C.    The Economic Loss Rule Does Not Apply.

Defendant argues Colorado's economic loss rule bars Plaintiffs' negligence and negligence *per se* claims. Mot. at 20-23. However, Defendant's argument misconstrues the economic loss rule, which does not apply absent any contractual relationship governing the duty. The rule dates from the *ACO Construction* case in which the Colorado Supreme Court stated;

> Consistent with this duty analysis, we now expressly adopt the economic loss rule. We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law.

*Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).

Here, Plaintiffs' negligence claims, as alleged, are not premised on an express or implied contractual duty. *See* SAC ¶¶ 306-10, 324-29. Although Plaintiffs also allege a breach of third-party beneficiary contract claim, they do so in the alternative, but discovery is necessary to confirm the scope of any contractual duty and whether it applies. Regardless, Plaintiffs' status as a third-party beneficiary does not dispense with Plaintiffs' ability to bring claims for the breach of the independent tort duty that Defendant directly owed Plaintiffs. At the motion to dismiss stage, before any discovery into the existence of any contract governing data security as to the Private

22

Information impacted in the Data Breach, alternative claims should be allowed to proceed. The District of Colorado reasoned accordingly in another data breach case: "[W]hile Plaintiffs are pursuing both negligence and implied contract claims concerning the same subject, and no discovery has yet been done to provide a fuller factual context, this court finds it premature to decide whether Colorado's law of special relationship applies and imposes the duty that Plaintiffs assert it does, or whether Colorado otherwise recognizes such a tort duty." *Owen-Brooks v. DISH Network Corp.*, 2024 WL 4338133, at *15 (D. Colo. Aug. 23, 2024), *report and recommendation adopted*, 2024 WL 4333660 (D. Colo. Sept. 27, 2024). In contrast, in *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill*, 353 F. Supp. 3d 1070 (D. Colo. 2018), which Defendants cite, the defendant attached to its motion to dismiss "excerpts of Visa and MasterCard's payment card network rules" to "establish that the parties' relationship arises out of a network of contractual obligations." *Id.* at 1083. No such contracts are before the Court here, so there is no way for it to evaluate at this juncture whether there is a contractual duty on point. Further, that case is different from the facts alleged here in which no direct contractual relationship is even alleged.

Therefore, Plaintiffs' economic losses such as mitigation expenses give rise to a negligence claim under Colorado law. Colorado tort law "recognizes that an injured party, who incurs expense in pursuing reasonable efforts to avoid or minimize the damaging effects of another's wrong, may recover for such expense as one of the items of damage for the wrong." *Banning v. Prester*, 317 P.3d 1284, 1288 (Colo. App. 2012); *Doe v. Conceptions Reprod. Assocs., Inc. d/b/a Conceptions Reprod. Assocs. of Colo.*, No. 25-CV-00009-NYW-CYC, 2026 WL 1145600, at *5 n.7 (D. Colo. Apr. 28, 2026) (Wang, J.) ("*Conceptions*"), ("[C]osts incurred in purchasing credit monitoring and identity theft services are cognizable expenses incurred for the purpose of avoiding further data-breach-related damages.") (citation omitted)). In particular, here, Plaintiff Potter alleges she

"signed up for an Experian credit monitoring service after the Data Breach, which costs her $19 monthly." SAC ¶ 86. This is sufficient for negligence.

Moreover, Plaintiffs do not allege *only* economic losses. *See AZCO Const., Inc.*, 10 P.3d at 1264. Rather, Plaintiffs specifically allege numerous non-economic losses, including privacy injury, SAC ¶¶ 73, 88, 102, 117, 132, 170, 187, fear for their personal financial security, worry and uncertainty about what information was exposed in the Data Breach, anxiety, sleep disruption, stress, fear, and frustration, *Id.* ¶¶ 77-78, 92-93, 106-07, 121-22, 136-37, 166, 169, 183, 186, 200, 203, as well as lost time spending monitoring their accounts to protect themselves from identity theft after the Data Breach. *Id.* ¶¶ 11, 209. For that reason alone, Plaintiffs' negligence claims are not barred under the economic loss rule.[3]

Finally, contrary to Defendants' misleading arguments, Defendants *did* owe Plaintiffs and Class Members an independent duty of care where, for example, the FTC Act and HIPAA impose the standard of care for Defendants to implement to protect Plaintiffs' privacy. Defendants cannot dispense with that duty merely by entering a contract with non-parties, even if Plaintiffs benefit from those contracts. Defendants argue Plaintiffs cannot pursue a claim under those statutes, which lack a private right of action. Mot. at 22. However, Colorado law permits Plaintiffs' claims for common law negligence based on the standard of care created by those statutes. To determine whether a duty exists for a negligence claim, Colorado courts "consider many factors, including (1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden guarding against injury or harm, and

---

[3] In addition, Plaintiffs outline a property damages theory of diminished value of their Private Information. *See* SAC ¶¶ 248-53 (alleging that Private Information is valuable personal property where the data was stolen "without any consideration paid to Plaintiffs or Class Members for their property." Numerous courts have recognized this theory as cognizable. *See, e.g., In re Marriott Int'l, Inc.*, 440 F. Supp. 3d at 460–62 (approving lost value of Private Information theory).

(4) the consequences of placing the burden upon the actor." *Owen-Brooks*, 2024 WL 4333660, at *2.

All of the factors are met here. With respect to the first factor, the risk to Plaintiffs is substantial because their Private Information is in the hands of unauthorized cybercriminals, putting Plaintiffs at risk for fraud and identity theft. *See* SAC ¶¶ 210-40. The harm was also foreseeable, because it is well known that Private Information—particularly Social Security numbers and medical information—is a valuable commodity and a frequent target of cybercriminals. *See id.* ¶¶ 44, 50-58. Social utility is served by Defendants acting to protect the owners of the Private Information in their possession from a known and obvious risk. Third, the burden on Defendants in guarding against the harm is reasonable and far smaller than the burden on Plaintiffs in addressing the harm after it has occurred. Finally, the consequence of placing the burden upon Defendants is fair, requiring the companies that store the Private Information in its networks to protect that information. By maintaining the Private Information on their systems, Defendants became the only entities in a position to safeguard it. Thus, Defendants had a duty to protect Plaintiffs' and the Class's Private Information.

### D.    Plaintiffs' Negligence Claim Is Otherwise Sufficiently Pleaded.

In addition to arguing Defendants owed no duty to Plaintiffs and Class Members, which is addressed in Section II.C *supra*, Defendants argue Plaintiffs' negligence claim is barred where Plaintiffs "do not allege any physical damage to persons or property," (quoting an asbestos case, *Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir. 1992)). Here, in contrast to the alleged economic losses in *GAF Corp.* which related to expectations of buyers of vinyl asbestos floor tile, Plaintiffs allege damage to their Private Information, which they plausibly allege is a "valuable property right," SAC ¶ 248, *see In re Marriott Int'l, Inc.*, 440 F. Supp. 3d at

461-62, as well as loss of privacy and emotional distress type damages, which have been held cognizable for negligence in data breach cases, *see, e.g.*, *Progressive*, 2025 WL 213744, at \*9. In addition, out-of-pocket losses were persuasively held to be cognizable under Colorado negligence law by this Court in the recent *Conceptions* case. *See Conceptions,* 2026 WL 1145600, at \*5.

As for causation, Colorado negligence claims must have "cause in fact" and "legal" or "proximate cause." *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287, 292 (Colo. 2020). Cause in fact is considered under a "but for" test. *Id*. Regarding Plaintiff Potter's out-of-pocket losses to pay for credit monitoring services, Plaintiffs plausibly allege Plaintiff Potter would not have purchased the Experian monitoring following the Data Breach, SAC ¶ 86, had the Data Breach not occurred. *See Conceptions*, 2026 WL 1145600, at \*6 (disagreeing with the defendants' argument at the motion to dismiss stage that plaintiff's injuries not caused by the data breach at issue, but could have arisen from another data breach, particularly as to one plaintiff's out-of-pocket losses). Despite Defendants' argument (Mot. at 24), there was no "intervening cause" just because a third-party cybercriminal carried out the breach. In *Deines v. Atlas Energy Servs., LLC*, 484 P.3d 798 (Colo. App. 2021), which Defendants cite, a driver failed to notice a stopped car nearly a third of a mile away and the court held the negligence causing an oil spill earlier in that area was "too attenuated" from the driver's negligence. In contrast, here, Plaintiffs allege it was Defendants' negligent cybersecurity practices that caused their injuries; therefore, Defendants' conduct directly "set in motion" the Data Breach and Plaintiffs' injuries.

Proximate cause uses the "substantial factor" standard in Colorado. *N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996). Defendants argue Plaintiffs fail to satisfy this element too. However, just as this Court reasoned in *Conceptions*, this is difficult to square with Plaintiff Potter's out-of-pocket expenses injury:

> [T]he Data Breach and Mr. Markowitz's resulting concern for his data are the sole alleged factors in his decision to enroll in monitoring services. The Court respectfully concludes that the Data Breach resulting from Defendants' allegedly deficient cybersecurity was a substantial factor in causing Mr. Markowitz's credit monitoring expenses.

*Conceptions*, 2026 WL 1145600, at *6. Nor are Plaintiffs required at this stage, prior to discovery, to outline detailed cybersecurity failings that may have led to the Data Breach.

> We cannot expect a plaintiff in Ramirez's position to plead with exacting detail every aspect of Paradies's security history and procedures that might make a data breach foreseeable, particularly where the question of reasonable foreseeability of a criminal attack is generally for a jury's determination rather than summary adjudication by the courts.

*Ramirez v. The Paradies Shops, LLC*, 69 F.4th 1213, 1220-21 (11th Cir. 2023)).

Plaintiffs' negligence claim is well-stated and should be allowed to proceed.

### E.    Plaintiffs' Negligence *Per Se* Claim Is Sound.

Defendants argue that Plaintiffs' negligence *per se* claim fails because the FTC Act and HIPAA do not contain a private right of action. This argument is without merit. Contrary to Defendants' argument (Mot. at 26-27), Plaintiffs do not bring a claim under the FTC Act or HIPAA but allege a common law negligence *per se* claim under Colorado law. "Under Colorado law, a statute can provide evidence of a standard of care for a negligence *per se* claim, even if the plaintiff does not have a right of action thereunder." *Owen-Brooks*, 2024 WL 4338133, at *16. For example, "[n]egligence *per se* occurs when a defendant violates a statute adopted for the public's safety and the violation proximately causes a plaintiff's injury." *Id.* (citation omitted). Accordingly, the court in *Owen-Brooks* recommended that plaintiffs be permitted to proceed with their negligence *per se* claim stemming from a data breach under the theory that HIPAA imposed obligations that set the standard of care in the case. *Id.* at *17.

At minimum, Plaintiffs state a negligence *per se* claim because HIPAA provides

27

administrative regulations and guidelines that establish the appropriate standard of care for cybersecurity of patient Private Information. *See Conceptions*, 2026 WL 1145600 at \*7-8 (allowing negligence *per se* claim premised on HIPAA standards of care). Plaintiffs allege Defendants failed to follow those standards of care and thereby breached their duties to Plaintiffs and Class Members, SAC ¶¶ 324-28, proximately causing them injury, *id.* ¶¶ 338-39. This sufficiently states a negligence *per se* claim.

F.    **Plaintiffs' Third-Party Beneficiary Contract Claim Is Sufficiently Pled.**

Defendants' challenge to Plaintiffs' third-party beneficiary claim asks the Court to draw inferences against Plaintiffs and treat them as mere incidental beneficiaries of Wakefield's contracts with its healthcare clients. That argument ignores the nature of the contracts and the information Wakefield received under them. Plaintiffs allege that Wakefield's healthcare clients supplied Wakefield with Plaintiffs' Private Information so Wakefield could perform revenue cycle and collections services involving that information. SAC ¶¶ 29–31, 65, 81, 110, 125, 157, 174, 191. Plaintiffs further allege that, in receiving and maintaining that information, Wakefield agreed to safeguard it in accordance with its internal policies, state law, and federal law. *Id.* ¶ 30. At the pleading stage, those allegations plausibly allege more than an incidental benefit. Plaintiffs were members of an identifiable class whose Private Information was the subject of Wakefield's agreements with its healthcare clients. Wakefield's promised data-security obligations were not merely for the abstract benefit of its healthcare clients,. existed to protect the patients whose PII and PHI Wakefield received, used, and maintained. *Id.* ¶¶ 30–31, 37. A third-party beneficiary need not be personally named in the contract so long as the beneficiary is part of an identifiable class intended to benefit from performance. *See* Restatement (Second) of Contracts § 308 (1981).

Defendants' argument also improperly depends on factual details of the contracts that are

28

not before the Court. Plaintiffs allege the existence of contracts between Wakefield and its healthcare-provider clients, that Plaintiffs' Private Information was provided to Wakefield pursuant to those contracts, that Wakefield undertook obligations to safeguard that information, and that Wakefield failed to do so. SAC ¶¶ 29–35, 342–44. These allegations plausibly encompass contractual obligations to safeguard Plaintiffs' Private Information and not undermine the purpose of those agreements. At this stage, Plaintiffs have plausibly alleged that they were intended beneficiaries of Wakefield's contractual obligations to protect patient information and that Defendants breached those obligations by failing to use reasonable safeguards, resulting in the exposure and theft of Plaintiffs' Private Information. *Id.* ¶¶ 35–45, 208–09.

Nor are Plaintiffs attempting to enforce HIPAA as a private cause of action. Plaintiffs rely on Defendants' data-security obligations, representations, and contracts with healthcare-provider clients to show the nature of the duties Wakefield undertook and the class of people those obligations were designed to protect. Defendants' attempt to recast the claim as an impermissible HIPAA claim misses the point. Plaintiffs' claim is contractual: Defendants received Plaintiffs' Private Information through healthcare-provider relationships, promised to safeguard that information, and failed to do so. The third-party beneficiary claim should not be dismissed.

### G.    Plaintiffs' Invasion of Privacy Claim Is Sufficiently Pleaded.

Defendants' attack on Plaintiffs' invasion of privacy claim rests on an overly narrow view of intent and ignores Plaintiffs' allegations that Defendants knowingly maintained deficient security practices despite the obvious sensitivity of the information and the known risk of cybercriminal access. Colorado recognizes intrusion upon seclusion where a defendant intentionally intrudes upon the plaintiff's solitude or private affairs in a manner that would be highly offensive to a reasonable person. *Pearson v. Kancilia*, 70 P.3d 594, 599 (Colo. App. 2003).

29

Plaintiffs allege that Defendants maintained sensitive PII and PHI, including Social Security numbers and health information, and knew that such information was private and vulnerable to misuse if exposed. SAC ¶¶ 2, 30–31, 37, 46–58. Plaintiffs further allege that Wakefield failed to implement reasonable cybersecurity safeguards, failed to use basic authentication protections, failed to encrypt sensitive information, and failed to timely notify affected individuals after the Data Breach. *Id.* ¶¶ 32–35, 38, 42–45, 49. These allegations support the reasonable inference that Defendants acted with the requisite intent, or at minimum with knowledge that unauthorized access to Plaintiffs' private affairs was substantially certain to result from their conduct. Indeed, given the ubiquity of data breaches, Defendant must have been substantially certain that its failure to invest in reasonable cybersecurity measures would lead to a data breach, satisfying the definition of intent. Restatement (Second) of Torts § 8A. Courts addressing similar data-breach allegations have also found that allegations of reckless disregard for confidential information may support an intrusion claim at this stage. *See Bowen v. Paxton Media Grp., LLC*, 2022 WL 4110319, at *7–8 (W.D. Ky. Sept. 8, 2022).

Plaintiffs also adequately allege offensiveness and damages. They allege their most sensitive health information was breached and that they suffered actual injuries, including attempted identity theft, dark web exposure, lost time, mitigation expenses, invasion of privacy, emotional distress, and continuing risk of fraud and misuse. *Id.* ¶¶ 37, 71–80, 86–95, 116–24, 129–39, 169–73, 186–90, 203–07. The unauthorized exposure of sensitive medical and identifying information is the type of intrusion a reasonable person would find highly offensive. Plaintiffs have therefore plausibly stated a claim for invasion of privacy.

## CONCLUSION

Accordingly, Defendants' Motion to Dismiss should be denied entirely.

30

Dated: May 4, 2026

Respectfully submitted,

By: */s/ Jeff Ostrow*
Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Gary M. Klinger
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

J. Gerard Stranch, IV
Grayson Wells
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

*Interim Co-Lead Class Counsel*

31

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

The undersigned counsel certifies that generative artificial intelligence was not used to draft this filing.

Dated: May 4, 2026                             */s/ Jeff Ostrow*
                                                Jeff Ostrow

**CERTIFICATE OF SERVICE**

The undersigned attorney of record hereby certifies that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: May 4, 2026                             */s/ Jeff Ostrow*
                                                Jeff Ostrow